**COALITION FOR BLOCK GRANT COMPLIANCE, National Association for the Advancement of Colored People (NAACP), Detroit Branch, Michigan Committee on Law and Housing, a Michigan Nonprofit Corporation, Vivian Franklin, Edna D. Perry, and Robert Hoover, on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD), Secretary of HUD, Assistant Secretary for Community Planning and Development of HUD, Edward McNamara, in his official capacity as Mayor of the City of Livonia, Michigan, John J. Nagy, in his official capacity as Planning Director of the City of Livonia, and the City of Livonia, Michigan, a Municipal Corporation, Defendants.**

Civ. A. No. 770503.

United States District Court,
E. D. Michigan, S. D.

Feb. 24, 1978.

Karen Krueger, Nat'l Committee Against Discrimination in Housing, Washington, D. C., Thomas C. Carey, Michael J. Barnhart, Detroit, Mich., for plaintiffs.

Barbara A. Babcock, Asst. Atty. Gen., Washington, D. C., Samuel Behringer, Jr., Asst. U. S. Atty., Detroit, Mich., Stanley D. Rose, David Epstein, Maryann Clifford, Dept. of Justice, Washington, D. C., Harry C. Tatigian, Livonia, Mich., for defendants.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

██ The plaintiffs, three community organizations and three low income minority residents of the City of Detroit, filed this suit for declaratory and injunctive relief to enjoin the Department of Housing and Urban Development (HUD) and the City of Livonia from receiving or expending grants approved by HUD under the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. § 5301 *et seq.* (Supp. V 1975). Plaintiffs allege that HUD approval of these grants violates the HCDA and the regulations promulgated thereunder as well as the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.,* and the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.[1]

---

1. Plaintiffs' complaint does not contain specific civil rights allegations and they have produced no evidence relating to these claims. It is apparent from a reading of the complaint and the numerous briefs and memoranda that plaintiffs never intended to rely upon those claims. Indeed, they do not seek relief under the civil rights act. In addition, plaintiffs filed this action as a class action, but never moved to certify the class. In any event, where a named plaintiff can obtain relief for members of a

On June 10, 1976, the City of Livonia and its officials (municipal defendants) applied for $590,000 in block grant funds for program year 1976.[2] When this application was publicized, the Plaintiff Coalition for Block Grant Compliance filed administrative complaints with the federal defendants, asserting that the City's Housing Assistance Plan (HAP) was deficient because it failed to set forth goals to meet the housing assistance needs of lower income families "expected to reside" in the City of Livonia.[3] In letters dated July 29 and August 6, 1976, HUD's regional office notified the City of Livonia that its HAP was deficient in that the goals it provided failed to meet identified needs of both existing residents of the city and those persons "expected to reside" in the city. Consequently, HUD's regional office recommended disapproval of the city's application because Livonia's housing assistance goals were "plainly inappropriate."[4]

On August 18, 1976, David O. Meeker, Jr., HUD's Assistant Secretary for Community Planning and Development, notified the municipal defendants that he would disapprove the city's application unless Livonia revised its HAP to propose housing goals to meet the needs of families "expected to reside" in the city. He emphasized the city's low vacancy rate and noted that the city's existing housing program would assist only families "in place." He insisted that Livonia's three-year housing assistance goal must include a minimum of 160 units of new construction for families and large families under Section 8, or some comparable program for rental assistance, and that 80 of these units must be reflected in Livo-

nia's current year housing goals.[5] On August 23, 1976, the municipal defendants met with Mr. Meeker in Washington and submitted a revised HAP. At that meeting, Livonia contended that their goals did meet existing needs since the number of vacant available units in Livonia was not 4, as indicated in Table 1 of their original HAP, but instead was 75. The city argued that there were 10 units available at any time, 20 units that would become available on completion of an apartment project, and 45 units that would be available for low income housing when a housing project for the elderly was completed, resulting in vacancies in units now occupied by persons targeted to move into the new project. HUD permitted Livonia to amend its HAP to reflect this figure of vacant units. Livonia's revised HAP was approved by agency inaction on August 24, 1976, the last day HUD could have rejected the revised HAP.[6]

The Plaintiff Coalition again complained to HUD about its approval of Livonia's revised block grant application, objecting that the revised HAP does not contain goals to meet the housing assistance needs of families "expected to reside" in the city.[7] HUD took the position then, as it does now, that while the Act requires a statement of the housing needs of persons "expected to reside" in the community, the Act does not require a specific housing goal to meet the needs of all persons expected to reside in Livonia.[8] The plaintiffs continue to allege that Livonia's HAP violates the Act in that it assesses inaccurately the condition of its housing stock by inflating its estimate of vacant available units in 1976 with units which are not in fact either vacant or avail-

proposed class, it is inappropriate to allow the action to proceed as a class action.

2. Plaintiffs' Exhibit # 2.

3. *See* Joseph Guggenheim's letter to Secretary Hills on August 6, 1976, Ex. G to the affidavit of Robert C. Embry.

4. *See* Ex. F to the Embry affidavit. The letter of July 29, 1976, is Ex. C to the Embry affidavit, while the letter of August 6, 1976, is Ex. I to the plaintiffs' motion for a preliminary injunction.

5. *See* Ex. H to the Embry affidavit.

6. *See* ¶¶ 11–17 of the Embry affidavit.

7. *See* ¶ 11 of the affidavit of Clifford Schrupp, attached to the plaintiffs' Memorandum in Opposition to the Municipal Defendants' Motion to Dismiss.

8. Federal Defendants' Memorandum in support of their Motion for Summary Judgment at 17.

able,[9] fails to provide for the needed construction of new housing for lower income families,[10] fails to propose housing assistance goals to meet the needs of lower income families and large families expected to reside in Livonia, despite the fact that such households make up 63 percent of its total housing assistance need.[11] The plaintiffs finally allege that defendants' action compels them to continue to reside in segregated inter-city dwellings far from their places of employment or planned employment, and deprives them of their right to housing opportunities outside areas of low income concentration as set forth in the Act.[12]

Plaintiffs did not move separately for a temporary restraining order to prevent the city from expending any of the remaining funds for the '76–'77 fiscal year until July 29, 1977, fully eleven months after approval of Livonia's application and after defendants filed their motion to dismiss. Plaintiffs' Motion for a Temporary Restraining Order was denied on August 1, 1977, principally because of their long delay in seeking temporary relief and their failure to make an adequate showing of probable success on the merits. Livonia did, nevertheless, agree not to draw any further funds until the court had an opportunity to resolve the issues presented.

Now pending before the court is the municipal defendants' motion to dismiss on numerous grounds, including a lack of subject matter jurisdiction, standing, and failure to state a claim upon which relief could be granted. Also pending is plaintiffs' motion for preliminary injunction filed August 9, 1977. A full scale hearing was held on August 9–10, at which all parties were afforded an opportunity to submit affidavits and present all the evidence they wished. At the conclusion of the evidentiary hearing all parties agreed that all matters pertaining to the factual issues in this litigation had been presented to the court. As a consequence, the parties agreed that the court could treat plaintiffs' motion for a preliminary injunction as a motion for summary judgment making this cause ripe for final disposition.

The plaintiffs now argue that Livonia's HAP violates the Act by failing to identify the housing assistance needs of persons "expected to reside" in the community as a result of planned employment and by failing to set goals which are appropriate to meet the housing assistance needs of those "expected to reside." They argue as well that in view of the city's low vacancy rate, the housing assistance needs of the "expected to reside" can only be met by construction of new federally subsidized rental housing in Livonia, but the city refused to include goals for new construction in its HAP. Plaintiffs conclude that Livonia's refusal to set goals in the HAP which meet their housing assistance needs has the effect of excluding them from the city, both now and in the future, and deprives them of their right to live in a racially and economically integrated environment, near their existing or planned employment; and therefore HUD's approval of Livonia's application was arbitrary, capricious, an abuse of discretion and violated the Act.

Community grants under Title I of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301, et seq., may be used in a variety of ways to encourage the economic development of communities. It is clear, however, that grants may not be used for the construction of new residential structures. 24 C.F.R. § 570.201(f) (1976); see 42 U.S.C. § 5305(a) (Supp. V 1975). Congress did, however, intend to affect the availability of new residential housing by passage of this Act. In the Congressional findings and declaration of purpose relative to the HCDA, Congress provided:

> The primary object of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expand-

---

**9.** ¶ 39 of the Plaintiffs' complaint.

**10.** ¶ 44b of the plaintiffs' complaint.

**11.** ¶ 44c of the plaintiffs' complaint.

**12.** ¶ 46 of the plaintiffs' complaint.

ing economic opportunities, principally for persons of low and moderate income. Consistent with this primary objective, the Federal assistance provided in this chapter is for the support of community development activities which are directed toward the following specific objectives—

\* \* \* \* \* \*

(6) the reduction of the isolation of income groups within communities and geographical areas and the promotion of an *increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for* persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods to attract persons of higher income; 42 U.S.C. § 5301(c) (1975 Supp.). (Emphasis added)

Although community grants may not be used for new housing construction, Title I seeks to "[foster] the undertaking of housing and community development activities in a coordinated and mutually supportive manner," *id.* § 5301(d)(4), and provide "a decent home" especially for those with low and moderate incomes, *id.* § 5301(c)(3). Congress sought to achieve these objectives by requiring that a community's grant application include a "housing assistance plan" (HAP) which "accurately surveys the condition of the housing stock in the community and assesses the housing assistance needs of lower-income persons . . . residing in or expected to reside in the community," *id.* § 5304(a)(4)(A), with "a realistic annual goal for the number of dwelling units," *id.* § 5304(a)(4)(B), indicating the "general location of proposed housing for lower-income persons," *id.* § 5304(a)(4)(C).[13]

Congress also provided for automatic approval of applications for these Title I funds. *Id.* § 5304(f). Thus, cities and counties are automatically "entitled" to the grant funds, *id.* § 5306(a), and an application is considered approved 75 days after it is submitted to HUD, unless the Secretary notifies the applicant of "specific reasons for disapproval." *Id.* § 5304(f). Congress did not, however, give the Secretary arbitrary freedom to allow automatic approval of applications which did not conform to the Act. Section 5304(c) provides that the Secretary shall approve an application unless

(1) on the basis of significant facts and data, generally available and pertaining to community and housing needs and objectives, the Secretary determines that the applicant's description of such needs and objectives is plainly inconsistent with such facts or data; or

(2) on the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant pursuant to subsection (a) of this section [paraphrased above];

\* \* \* \* \* \*

The federal defendants admit that they did not consider whether Livonia's application included a HAP which provided appropriate goals to meet the needs of those persons "expected to reside" in Livonia. The federal defendants submitted the affidavit of Mr. Robert Embry, the present Assistant Secretary for Community Planning and Development, which clearly explains the process that HUD used in ap-

---

13. 42 U.S.C. § 5304(a)(4) (Supp. V 1975) provides in part:

No grant may be made pursuant to section 5306 of this title unless an application shall have been submitted to the Secretary in which the applicant—\* \* \*

(4) submits a housing assistance plan which—

(A) accurately surveys the condition of the housing stock in the community and assesses the housing assistance needs of lower-income persons (including elderly and handicapped persons, large families, and persons displaced or to be displaced) residing in or expected to reside in the community,

(B) specifies a realistic annual goal for the number of dwelling units or persons to be assisted, including (i) the relative proportion of new, rehabilitated, and existing dwelling units, and (ii) the sizes and types of housing projects and assistance best suited to the needs of lower-income persons in the community,

\* \* \* \* \* \*

proving Livonia's application. In paragraph 15 of that affidavit, Mr. Embry points out that HUD was advised by its general counsel that Livonia's application was legally sufficient since the HCDA, and particularly the implementing regulations, did not require a community to develop goals in its HAP which meet specific housing needs of persons "expected to reside" in the community. *See* 24 C.F.R. § 570.303(c)(3) (1976) (requiring specific goals only for persons in the community). Since approval of Livonia's application, however, the Assistant Secretary has promulgated a set of instructions to HUD field personnel which now require that the goal set forth in the HAP meet the specific needs of the "expected to reside." *See* pages 6–7 of HUD notice CPD 77–10, attached to Mr. Embry's affidavit as Exhibit L. Thus, the Assistant Secretary now acknowledges that a HAP substantially identical to that of Livonia's would very likely be disapproved by HUD. Indeed, Livonia's application for funds for fiscal year 1977–78 has again been recommended for disapproval by HUD's regional office, on the grounds that the goals specified in the HAP including goals for persons "expected to reside" in Livonia did not meet existing needs. *See* ¶ 12 of the affidavit of Henry Levandowski, HUD's Program Manager in the Detroit office. Moreover, Mr. Levandowski testified that he did not approve Livonia's original HAP and would have disapproved the August 24, 1976 revised HAP as well because the goals outlined by Livonia in both plans were inappropriate to meet the needs indicated. He also noted that the goals specified were not, in his opinion, sufficient to meet the needs even of present residents of Livonia, let alone the "expected to reside."

■ The municipal defendants argue that 42 U.S.C. § 5304(a)(4)(B) only requires that goals be set for "persons to be assisted" and does not directly speak to persons "expected to reside." It is not, however, realistic to require that Congress continually reiterate its intention before effect can be given to that intention. Here, "persons to be assisted" clearly refers back to

§ 5304(a)(4)(A) which speaks to persons "residing in *or* expected to reside in the community." (Emphasis added.) This conclusion is supported by the requirement in section 5304(c)(2) that the Secretary determine whether the goals in the HAP are plainly inappropriate to meet the needs and objectives identified in section (a)(4)(A). The statement of intent contained in section 5301(c)(6) directly supports our conclusion.

■ Congress clearly required a municipality to identify the needs of and set goals for persons "expected to reside" in the community before Title I funds could be approved. This was the Congressional quid pro quo tied to these Title I grants. *See Hartford v. Hills*, 408 F.Supp. 889, 902 (D.Conn.1976), *rev'd on other grounds* (2nd Cir. 1977). The Assistant Secretary of HUD approved Livonia's application without even considering whether the goals provided for those "expected to reside" met the needs identified. We conclude that the approval of Livonia's application was a clear abuse of discretion within the meaning of *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Consequently, the plaintiffs are entitled to the injunctive relief they seek. This conclusion makes it unnecessary for us to reach the question whether Livonia's plan is so clearly inappropriate that it would be an abuse of discretion for the Secretary to ever approve it. There is, however, substantial evidence in the record to show that (1) the goals set out do not come close to meeting the needs identified, even of present residents of the city, and (2) the vacancy rate of 85 specified in the revised application of August 23, 1976 improperly includes vacancies that are based on housing that is barely out of the planning stage and which may not be finished within the term of the plan.

■ Several additional arguments the defendants submit, to defeat the result we reach, do not have merit. First, defendants claim that 24 C.F.R. § 570.300(c)(1976), requires that plaintiffs file objections to the

HAP within 15 days of publication in order for them to object to the data at this time. We think that this regulation, however, was solely intended to insure that HUD had all the factual data before it when making its determination on the validity of the HAP. The plaintiffs did submit their objections to HUD before the final decision on Livonia's application was made, and HUD apparently considered them. In any event, we ruled in plaintiffs' favor on procedural grounds and not on the basis of any inadequate data contained in the HAP.

■ Next, the defendants argue that any relief granted to plaintiffs would be inappropriate since the time period for which the instant HAP was to apply has almost expired. They contend that plaintiffs could not derive a benefit by requiring Livonia to amend its HAP in order to expend the remainder of the grant. Our interpretation of the Act renders this argument irrelevant. Congress has decreed that communities may receive grants only after full compliance with all of the requirements of the Act. Thus, it would be inappropriate to allow Livonia to receive further funds at any time unless their HAP is properly approved. The defendants misinterpret the significance of the HAP. There is no provision in Title I permitting these grants to be used to meet the needs outlined in the HAP, and indeed, the funds cannot be so used. Congress' purpose in requiring a HAP, therefore, was to insure that communities would take into account problems of those "expected to reside" and demonstrate a willingness to develop a plan which would relieve their problems. It is apparent that Livonia has been receiving grants without fulfilling this important purpose in the Act, and they should not receive further funds until they have fulfilled that requirement.

■ In seeking dismissal of this action, the municipal defendants contend that this controversy is not ripe for adjudication because there are significant post approval remedies available to plaintiffs. 42 U.S.C. § 5304(d) (requiring the Secretary to make an annual review to determine compliance with the program described in the HAP).

Defendants argue that a court should not interfere with an administrative decision until complete effect of that decision is experienced in a concrete way. Because plaintiffs contend, however, that the *application* is inadequate, the matter is ripe for adjudication despite the availability of post approval remedies which are addressed to *compliance* with the application. Consequently, these post approval remedies have no impact on this litigation. *NAACP v. Hills*, 412 F.Supp. 102, 106 (N.D.Cal., 1976).

■ The defendants further complain that plaintiffs have not exhausted their administrative remedies. The defendants have not, however, directed our attention to any further federal administrative remedy available to the plaintiffs to challenge the validity of Livonia's application, and we are not aware of any. It is clear to us that plaintiffs have a cause of action to challenge a grant after it has been approved. *See Hartford v. Hills, supra.* Moreover, the plaintiffs need not exhaust their state remedies before bringing a federal action. *McNeese v. Board of Education*, 373 U.S. 668, 674, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

Our jurisdiction in this matter cannot be seriously questioned. Plaintiffs have presented an important question of federal law and more than $10,000 in controversy is involved. 28 U.S.C. § 1331 (1970); *see, NAACP v. Hills*, 412 F.Supp. 102, 106 (N.D. Cal.,1976); *Knoxville Progressive Christian Coalition v. Testerman*, 404 F.Supp. 783, 787 (E.D.Tenn., 1975).

The defendants vigorously argue that plaintiffs lack standing citing *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). We disagree. In *Warth*, the decision that plaintiffs lacked standing was grounded upon the plaintiffs' inability to demonstrate that defendants acts caused injury to themselves, rather than other unidentified members of the class to which they belonged. In *Warth*, none of the petitioners had a present interest in any Penfield property, none was himself subject to the strictures of the ordinance, and none had ever been denied a variance or permit

by the respondent officials. Plaintiffs' alleged injury was the deprivation of housing opportunities in Penfield, but as the court pointed out, they were unable to show that members of their class would have lived in Penfield but for the complained of conduct. In contrast, the instant plaintiffs have not complained that they have been deprived of housing facilities in Livonia; they complain of a violation of the HCDA by HUD. That violation directly concerns agency approval of a housing assistance plan which does not meet the Congressional mandate to plan for persons such as these plaintiffs.

The issue of standing was thoroughly analyzed in *City of Hartford v. Towns of Glastonbury*, 561 F.2d 1032 (2nd Cir. 1977) (en banc). The Second Circuit Court of Appeals held in a split decision that one city's housing assistance plan could not be attacked by either another city or by other persons "expected to reside" in the applying city because those plaintiffs lacked standing to obtain a remedy. That court noted that the "expected to reside" estimate was a "relatively small part of a very large application" and that "it is impossible to know whether the lack of expected to reside figures on the first year applications . . . had, or will have, any detrimental effect upon [plaintiffs]." *Id.* at 1050. Finally, the court noted that "[t]he expected to reside figure . . . is a device used to plan for future population changes, not a device for achieving them." Thus, the Second Circuit concluded that plaintiffs had not established an alleged injury connected to the unlawful conduct of the defendants and denied them standing to redress that injury.

We are unable to adopt that conclusion. Rather, we adopt the dissent of Judge Oakes as more accurately interpreting Congressional intent in passing Title I of the 1974 HCDA. Congress distinctly stated that these plaintiffs have an interest in having their needs *planned for*. These plaintiffs are not complaining, as the *Warth* plaintiffs did, that their injury lies in the fact that they cannot live in Livonia. Instead, these plaintiffs complain that Livonia did not *plan* for their needs as Congress

directed. In the language of Congress, the HAP alone is a benefit to these plaintiffs, and we are not willing to look behind that Congressional decision to hold that plaintiffs are not *really* benefited by the HAP. If these plaintiffs lack standing, there will be no one able to enforce Congress' intent. We will not assume that Congress passed a statute it knew could not be enforced, especially as to a provision that is such an integral part of the statute. *See Knoxville Progressive Christian Coalition v. Testerman*, 404 F.Supp. 783, 788 (E.D.Tenn.1975) (dicta).

Since *Warth* is inapplicable, plaintiffs' standing to bring this action must be determined by the test first announced in *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Court there announced that the "gist of the question of standing" is whether the parties seeking relief have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." This test for standing was reaffirmed in association of *Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–54, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970):

> The question of standing . . . concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

Standing in this context thus requires that plaintiffs themselves were injured in fact (i. e., have a sufficient interest in the outcome of the litigation) and be arguably within the zone of interest sufficiently to assure the advocacy essential in an actual case or controversy. Plaintiffs allege that the violation of the statute by HUD produced their injury in fact. The named individual plaintiffs, who allege that they are persons "expected to reside" in Livonia, certainly are within the "zone of

interest" created by the HCDA. Consequently, the low income minority residents of the City of Detroit, who allege that they are "expected to reside" within the meaning of the statute, do have standing, as do the individual members of plaintiff NAACP, who fall within the intent of the Act.[14]

Thus, because the Secretary's abuse of discretion in approving Livonia's community development grant violated the HCDA and because plaintiffs have standing to bring this action, an order will issue enjoining defendants from drawing upon the funds allocated.

IT IS SO ORDERED.

---

**14.** In our view, neither the Coalition for Block Grant Compliance nor the Michigan Committee on Law and Housing has standing since they lack members who have suffered injury in fact. Both of those organizations are made up solely of other organizations without interest in the outcome of the litigation. On the other hand, the NAACP has standing since the requirement for an organization to have standing is that it establish injury to one of its members, so long as the interests the organization seeks to protect are germane to its purposes. *See Hunt v.*

*Washington State Apple Advertising Commission,* 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. 2197. Consequently, if this case had not been concluded, we would have dismissed the plaintiff Coalition and Michigan Committee on Law and Housing; however, since we find that the individual plaintiffs and the NAACP have standing, we do not. It is immaterial whether or not the organizational plaintiffs were permitted to proceed.