N. A. A. C. P., BOSTON CHAPTER, et al., Plaintiffs, Appellants,

v.

Patricia HARRIS et al., Defendants, Appellees.

LATINOS UNIDOS DE CHELSEA EN ACCION, INC., et al., Plaintiffs, Appellants,

v.

Patricia HARRIS, etc., et al., Defendants, Appellees.

Nos. 79–1051, 79–1114.

United States Court of Appeals, First Circuit.

Argued May 10, 1979.

Decided Oct. 18, 1979.

**516**

Alan Jay Rom, Boston, Mass., for plaintiffs, appellants in both cases.

Thomas I. Atkins, Boston, Mass., with whom Atkins & Brown, Edward J. Barshak, Boston, Mass., Natasha C. Lisman, Katherine S. McHugh, Sugarman, Rogers, Barshak & Cohen, Boston, Mass., Judith S. Bernstein, Chicago, Ill., and Mark S. Brodin, Boston, Mass., were on brief, for plaintiffs, appellants in No. 79–1051.

Roger Mervis, Karen Kruskal, Chelsea, Mass., Frank Smizik, Pittsburgh, Pa., Richard Allen, Daniel B. Bickford, Stuart T. Rossman, and Gaston, Snow & Ely Bartlett, Boston, Mass., were on brief, for plaintiffs, appellants in No. 79–1114.

Richard D. Glovsky, Asst. U. S. Atty., Chief, Civ. Div., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for defendants, appellees.

Before CAMPBELL and BOWNES, Circuit Judges, and DEVINE,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiffs brought these two civil rights actions against officials of the Department of Housing and Urban Development (HUD) challenging the disbursement of federal funds to the cities of Boston and Chelsea, Massachusetts, and seeking conditions to as-

sure that any funds provided be used in a non-discriminatory manner. Plaintiffs maintain that HUD's actions with respect to the cities' requests for money under the Community Development Block Grant (CDBG) program, 42 U.S.C. §§ 5301–5317, and the Urban Development Action Grant (UDAG) program, 42 U.S.C. § 5318, violate HUD's duty to ensure minorities equal access to the benefits of funded projects. The district court dismissed for lack of standing the portion of each complaint relating to UDAG funds[1] and entered partial judgments for the defendants under Fed.R. Civ.P. 54(b). These appeals followed.

The Housing and Community Development Act of 1977 established a new program—UDAG—for funneling federal dollars to the nation's hard-pressed cities. The Act authorizes annual funding of $400 million for three years. Cities submit project proposals to HUD designed to "take advantage of unique opportunities to attract private investment, stimulate investment in restoration of deteriorated or abandoned housing stock, or solve critical problems resulting from loss of employment or chronic unemployment in the community." H.R. Rep. No. 95–236, 95th Cong., 1st Sess. 9, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 2884, 2892. Projects are expected to combine public and private resources.

The Act provides that only municipalities "that have, in the determination of the Secretary, demonstrated results" in housing low and moderate income citizens and in providing equal opportunity for minorities are eligible for UDAG funds. 42 U.S.C. § 5318(b). The Secretary is not required to fund all the proposals submitted by eligible cities. The Act instructs the Secretary to select projects on the basis of at least nine criteria, with primary focus on the comparative degree of physical or economic distress of applicant cities. § 5318(e). HUD itself has promulgated regulations concern-

---

\* Of the District of New Hampshire, sitting by designation.

1. The court refused to dismiss on standing grounds the portion of each complaint challenging the CDBG grants. No question relative to that program is now before us.

ing eligibility of applicants, 24 C.F.R. § 570.452, and criteria for selection of projects, 24 C.F.R. § 570.457.

### 1. *The Boston Grants*

Shortly after passage of the 1977 Act, Boston submitted an application for $27.46 million for four proposed projects: the Charlestown shipyard, the South Boston industrial park, Lafayette Place downtown, and Blue Hill Avenue in Roxbury. It is alleged in the complaint that HUD received a report in February 1978 from the Massachusetts Commission Against Discrimination (MCAD)[2] recommending that HUD not approve the UDAG proposals without imposing "specific conditions" relating to equal employment and housing. In March, two public interest groups, including co-counsel in the present case, filed an administrative complaint challenging HUD's determination that Boston was eligible for funds as a city that had "demonstrated results" in providing opportunities to minority group members.

On April 6, 1978 HUD informed Boston that it had approved $2.48 million for Charlestown and $8 million for Lafayette Place.[3] As indicated in the affidavit of Margaret B. Sowell, deputy director of HUD's UDAG office, actual funding was contingent on HUD and Boston entering into a formal contract called a Funding Approval, containing the terms and conditions HUD intended to place on the funds. The record does not establish what conditions HUD actually imposed, but Sowell's affidavit states that HUD intended to re-

quire "at a minimum," firm commitments from private investors, environmental clearances, a legal opinion that private investor commitments were binding, and a compliance schedule for performance. *See* 24 C.F.R § 570.458(c). There is no indication HUD contemplated imposing any conditions relating to equal opportunity or affirmative action.

On April 17, 1978 the National Association for the Advancement of Colored People (NAACP) and nine black residents of Boston filed this suit in the district court, complaining that HUD's approval of the UDAG projects, together with its actions regarding the CDBG program, violated the plaintiffs' statutory and constitutional rights.[4] Plaintiffs' motion for a temporary restraining order was denied on August 3, 1978. The district court found with regard to the UDAG funds that plaintiffs probably lacked standing.[5] An essential requirement of Article III, the court said, is that the remedy requested by the plaintiff be one that is likely to redress the asserted injury. Since the granting of UDAG funds is supposedly conditioned on a city's past performance in providing equal opportunity, acceptance of plaintiffs' allegations would preclude redress. "If this court were to grant the relief requested, the city of Boston would be denied UDAG funds at the present time and it is purely speculative that plaintiffs and other Boston residents would materially benefit from these UDAG funds in the future," the court stated. Subsequently, on January 2, 1979 the district court granted defendants' motion to dismiss "so much of

---

**2.** Under 24 C.F.R. § 570.455(d), state agencies are designated in each of several areas to conduct what are called A–95 reviews, pursuant to OMB Circular No. A–95. The record indicates MCAD has been designated to review UDAG applications for compliance with applicable civil rights laws.

**3.** Plaintiffs assert in their brief that a third project has since been approved.

**4.** The provisions on which plaintiffs based their claims are:
   1) Title I of the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq.* and 24 C.F.R. § 570.601;

2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* and the regulations at 24 C.F.R. §§ 1.1–1.12;
3) Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*; and
4) the Due Process Clause of the Fifth Amendment.

**5.** The same order also denied the request for a TRO enjoining disbursement of CDBG funds, on the ground plaintiffs had not shown a substantial likelihood they would prevail on the merits.

the complaint as seeks relief with respect to the release of UDAG funds," stating:

> "In my opinion, the plaintiffs do not have standing, for the reasons stated in my denial of the motion for a temporary restraining order. While, as plaintiff says, the defendants could, and possibly should have, conditioned the grant on the enforcement of nondiscriminatory employment practices in the several projects, this is not a statutory condition of the grant."

### 2. The Chelsea Grants

The city of Chelsea applied for $12.73 million in UDAG funds in February 1978. The city's proposal called for renovation of the former Chelsea Naval Hospital site, including construction of luxury housing by a private developer and of subsidized low-income housing for the elderly. This proposal was reviewed by the Massachusetts Commission Against Discrimination, see note 2 supra, which recommended conditional approval subject to imposition of specific equal opportunity conditions. In particular, MCAD suggested Chelsea should be required to provide more low-income housing for younger families, in light of the high proportion of minorities among the nonelderly population. 1978 HUD informed Chelsea's mayor that the city had been found eligible for UDAG funds. Plaintiffs allege that on August 1, 1978—although plaintiffs' administrative complaint and the MCAD review were still pending—HUD unconditionally approved Chelsea's amended application for $6.7 million.

Latinos Unidos de Chelsea En Accion, Inc. (LUCHA), a group representing Hispanic residents of Chelsea, and four individual Hispanic residents filed suit in the district court on October 18, 1978, to challenge HUD's approval of the UDAG application, and its actions regarding Chelsea's CDBG funding. On February 22, 1979 the district court denied plaintiffs' motion for a temporary restraining order and dismissed the UDAG claim altogether, referring to its earlier decision in *NAACP v. Harris*. As in *NAACP*, the district court entered partial judgment under Fed.R.Civ.P. 54(b), permitting immediate appeal in this court.

## I.

These appeals present the narrow issue whether the district court erred in dismissing the two complaints on the sole ground that plaintiffs all lacked standing. The heart of the standing doctrine as it has developed over the past two decades is the requirement that a plaintiff have a "personal stake" in the outcome of the lawsuit, evidenced by the existence of "injury in fact." See Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). "As refined by subsequent reformulation, this requirement of a 'personal stake' has come to be understood to require not only a 'distinct and palpable injury,' to the plaintiff, . . . but also a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." Duke Power, 438 U.S. at 72, 98 S.Ct. at 2630. And the latter requirement is said to imply a third: namely, "a showing that there is a 'substantial likelihood' that the relief requested will redress the injury claimed." 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20. See also City of Hartford v. Towns of Glastonbury, 561 F.2d 1032, 1050 (2d Cir. 1976) (en banc).

Each of these interrelated requirements has recently been discussed by the Supreme Court. In O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the Court decided that nineteen plaintiffs who claimed to be threatened with discriminatory bail and sentencing treatment had not made out the requisite degree of personal injury to invoke the Court's jurisdiction. "Abstract injury is not enough," the Court said. "It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct." Id. at 494, 94 S.Ct. at 675.

In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the absence of a causal connection between the challenged zoning law and the plaintiffs' harm especially troubled the majority. As the Court stated, 422 U.S. at 504, 95 S.Ct. at 2208:

> "Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed."

The *Warth* Court indicated it might be more receptive to challenges directed at specific restrictions on particular housing project proposals. *Id.* at 516, 95 S.Ct. 2197. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court confirmed this indication, holding that the plaintiff—a developer seeking permission to construct low-income housing—had standing to challenge refusal of a zoning variance for the project. "When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." 429 U.S. at 261–62, 97 S.Ct. at 561.

The final factor of redressability is illustrated in the Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization (EKWRO)*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Declaring that a "federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court," 426 U.S. at 41–42, 96 S.Ct. at 1926, the majority found the complaint unavailing because it was "purely speculative" whether the harm of immediate concern to plaintiffs could fairly be traced to the actions of the defendant. *Id.* at 42–43, 96 S.Ct. 1917. As a result, there could be no assurance that any relief the Court granted would actually benefit the plaintiffs. *Id.* In *Duke Power*, by contrast, the Court upheld plaintiffs' standing where the district court had found a "but for" relationship between the challenged statute and the alleged harm. 438 U.S. at 75, 98 S.Ct. 2620.

█ In sum, the recent cases turn largely on the extent to which it appears that plaintiff is suffering tangible harm traceable to the challenged actions of the defendant—harm which will be lessened if the requested remedy is granted.

## II.

The district court treated the UDAG section of the complaint[6] as raising but a single issue, namely whether or not Boston was eligible under § 5318(b) to receive UDAG funds. The court apparently saw its options either as finding the city eligible, in which case plaintiffs would receive no relief, or finding the city ineligible, in which case Boston would be cut off from all UDAG funds. In the latter event, plaintiffs' injury—their inability to share in the benefits of funded projects—could not be redressed, since no one would benefit from projects that were never built.

Plaintiffs maintain on appeal that the court erred in failing to recognize that their complaint actually involves two distinct issues. Besides disputing Boston's eligibility for UDAG funds, plaintiffs say they also seek relief ensuring that any projects that *are* funded are carried out in conformity with non-discrimination provisions of federal law, such as Titles VI and VIII, *see* note 4 *supra,* and the due process clause of the fifth amendment. Thus, they say, they are asking the court to compel HUD to condition any UDAG grants on the city's meeting certain equal opportunity and affirmative action standards.[7]

6. Because LUCHA in its brief adopts the arguments presented by NAACP, we focus on the Boston case. Our discussion of that case, however, is equally applicable to the similar issues in the Chelsea case.

7. Plaintiff NAACP's complaint stated:
"Plaintiffs allege that defendants have unlawfully approved, and/or provided and continue to provide the City of Boston with millions of dollars in [CDBG and UDAG] funds . . . .

■ In considering the threshold issue of standing, it is not, of course, the court's responsibility to pass finally on whether plaintiffs will prevail on their statutory or constitutional claims. Assuming their claims have minimal substance, the question is merely whether *these* plaintiffs are appropriate parties to raise such claims.

> "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. . . .
>
> . . . As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."

*Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original).

### A.

■ We address first the question of plaintiffs' standing to challenge Boston's eligibility for UDAG funds. To the extent this lawsuit merely contests eligibility, we agree with the district court that the relevant relief—cutting off of funds—would not relieve plaintiffs of the injuries of which they complain, and that they therefore lack standing to seek such relief.

The UDAG program is currently authorized for three years of funding. HUD approves applications from individual eligible cities for specific projects. If Boston is declared ineligible for grants until such time as the city satisfies the "demonstrated results" test, all the grant funds may well be expended elsewhere before the city is able to apply for them. Denying everyone in Boston the benefits of this emergency funding program for distressed cities does not seem well calculated to redress the housing needs of those who have been victims of discrimination.

Plaintiffs, indeed, concede that "flat denial of UDAG funds to the City of Boston is neither the sole available relief nor the most desirable"; but they nonetheless argue that even the denial of eligibility would be a kind of redress of their grievance. They say they seek not just jobs or housing per se, but *equal access* to the housing and employment benefits of UDAG. Equality would be achieved—if only the equality of equal misery—if funds were denied to everyone in Boston. The difficulty with this approach is that a mere abstract denial of equal opportunity does not constitute injury in fact. A general denial of equal opportunity does not confer standing on a particular individual unless that individual would have had access to the benefit at stake in the absence of discrimination.

Illustrative of this principle is our decision in *Jackson v. Dukakis*, 526 F.2d 64 (1st

despite their knowledge that minority persons are being excluded from equal access to the benefits of the programs funded by these funds. Defendants have further failed to implement meaningful and effective measures to enforce and monitor compliance with nondiscrimination provisions required by law." Similarly, the complaint in *LUCHA v. Harris*, stated:

"Plaintiff LUCHA's members have been, are being, and will be aggrieved by the failure of the defendants to enforce equal opportunity requirements in housing and employment with regard to Chelsea's use and proposed use of CDBG and UDAG funds. Such members . . . are being denied equal access to the benefits of the CDBG and UDAG programs and activities in that they are effec-

tively excluded from participation in such programs and activities by the failure of the defendants to enforce the civil rights laws." Each complaint closed with a broad prayer for relief asking the district court to enjoin HUD from "approving, granting, disbursing, transferring, expending, committing, or otherwise disposing of" funds to the cities,

"until such time as the defendants submit and the Court approves a comprehensive plan, to be monitored by the Court, which will abate and prevent the racially discriminatory acts, practices, and/or policies complained of and assure effective control and monitoring of all Federal financial assistance provided by the defendants to the City of Boston [Chelsea]."

Cir. 1975). A black resident of Boston challenged the hiring practices of sixteen state agencies under the Equal Protection Clause and 42 U.S.C. §§ 1981 and 1983. Although plaintiff may have had a cause of action, to the extent he alleged a discriminatory pattern of failing to hire minorities, we nevertheless held he had not alleged the requisite causal connection between the state's violations and his own status as an unemployed person. Because he had never applied to the state for a job, it could not be said he had suffered any harm as a result of the state's policy.

> "Although the categories of judicially cognizable injury have been broadened to include noneconomic injuries, [citations omitted], the Supreme Court has recently 'stressed that the broadening of *categories* "is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." ' "

526 F.2d at 65 (emphasis in original).

To be sure, every court has not analyzed the question in this same way. *See, e. g., Coalition for Block Grant Compliance v. HUD,* 450 F.Supp. 43 (E.D.Mich.1978); *Knoxville Progressive Christian Coalition v. Testerman,* 404 F.Supp. 783, 788 (E.D.Tenn. 1975) (dictum). *But see City of Hartford v. Towns of Glastonbury,* 561 F.2d 1032 (2d Cir. 1977) (en banc). In *Coalition for Block Grant Compliance, supra,* community organizations and minority residents of Detroit sued HUD seeking to halt the flow of CDBG funds to the suburban city of Livonia, because Livonia's CDBG application did not contain adequate "expected to reside" figures, as required by law. The Michigan district court rejected defendants' motion to dismiss for lack of standing, holding that since plaintiffs alleged they expected to reside in Livonia, the failure to plan for their housing needs produced an injury to them. The court distinguished *Warth v. Seldin* on the ground that "plaintiffs are not complaining, as the *Warth* plaintiffs did, that their injury lies in the fact that they cannot live in Livonia. Instead, these plaintiffs complain that Livonia did not *plan* for their needs as Congress directed." 450 F.Supp.

at 51 (emphasis in original). Later in the opinion the court stated approvingly: "Plaintiffs allege that the violation of the statute by HUD produced their injury in fact." *Id.*

By contrast, the en banc Second Circuit, in *City of Hartford, supra,* held that nonresident plaintiffs had no standing to challenge a town's omission of "expected to reside" figures. Increasing those figures would not lead to more housing being built, the court found, because the defendant towns had already received all the funds to which they were entitled. "Consequently, the prospect that the submission of accurate expected to reside figures sought by the plaintiffs will have a positive effect on the plaintiffs' expectancy interest is at best speculative." *Id.* at 1051. It seems evident that the Second Circuit did not believe mere violation of the statutory requirement raised a right of standing for plaintiffs; the violation must lead to a material harm to the plaintiffs which the court is empowered to relieve. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

We recognize that in circumstances different from those present here, the threat of denial of funds is a form of relief that could meaningfully redress the discriminatory abuse of those funds. In *Committee for Full Employment v. Blumenthal,* 196 U.S.App.D.C. ——, 606 F.2d 1062 (1979), several minority individuals, and organizations representing them, sued the Office of Revenue Sharing for continuing to provide funds to cities that allegedly violated civil rights provisions of the Revenue Sharing Act. The court of appeals reversed the dismissal of the complaint for lack of standing, on the ground, *inter alia,* that plaintiffs' allegations sufficiently established a likelihood the relief they requested would provide a benefit. The court noted that plaintiffs alleged the recipient cities were "dependent on revenue sharing funds to carry out vital municipal activities." *Id.* at ——, 606 F.2d at 1066. These govern-

ments were also independently obligated to observe plaintiffs' civil rights, the court pointed out. They did not have the option to refuse funds and continue to discriminate. *Id.*

Here, on the other hand, the UDAG grants will not be used to finance essential city services. Boston is not compelled to take these funds regardless of the strings attached. Further, while the city is itself obligated by law not to engage in discrimination, it is not obligated to build these particular projects; the option exists to drop them altogether, cutting off the benefits to everyone. Most significantly, plaintiffs in this part of their action are seeking to have Boston declared *ineligible* for funds pursuant to an express statutory provision linking eligibility with past conduct. In order to reestablish its eligibility, the city would have to "demonstrate results" in providing equal opportunity in its remaining programs. 42 U.S.C. § 5318(b). We agree with the district court that it is problematic whether such a demonstration could be achieved within the period when UDAG funds will still be available to the city.

### B.

Lack of redressability is therefore a bar to standing, insofar as plaintiffs would attack Boston's eligibility for UDAG funds. But as plaintiffs point out, their complaint is not limited to a challenge to eligibility. The complaint also speaks in terms of HUD's failure to implement "meaningful and effective measures to enforce and monitor compliance with non-discrimination provisions required by law." The relief sought is cast in terms of curtailing federal

financial assistance to Boston only until such time as the defendants submit and the court approves a comprehensive plan, to be monitored by the court, which will "abate and prevent the racially discriminatory acts . . . ." The Supreme Court has observed that "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206. We construe the complaint as in effect requesting, in the alternative, that the court take action to ensure that any project which HUD decides to fund is conducted in compliance with anti-discrimination laws and the federal constitution.

■ The district court upheld plaintiffs' standing to challenge CDBG grants, in part because it found that HUD, in a proper case, might be required to condition. these funds on the city's meeting specific requirements of the civil rights section of the HCDA, 42 U.S.C. §§ 5304 *et seq.*[8] *See also* 24 C.F.R. § 570.910. The court apparently determined, however, that UDAG funds could not be so conditioned under the same statutory provisions.[9] The court seems to have decided that § 5318(b)'s eligibility requirements were the only judicially enforceable limitations on HUD's authority to commit funds under UDAG. While this view of the law may eventually be proven correct, we think it premature to make such a far-reaching ruling now, as part of a threshold determination of standing. Title VI, 42 U.S.C. § 2000d, prohibits discrimination in federally assisted programs and activities.[10] If plaintiffs can succeed in showing a par-

---

8. The court also noted that CDBG funds could readily be allocated from discriminatory uses to non-discriminatory ones within the same metropolitan area. *See* 24 C.F.R. § 570.-409(d)(1)(i).

9. In its order on the motion to dismiss of January 2, 1979, the court said, "While, as plaintiff says, the defendants could, and possibly should have, conditioned the grant on the enforcement of non-discriminatory employment practices in the several projects, this is not a statutory condition of the grant."

10. The substantive provision of Title VI reads as follows:

> "No person in the United States shall on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

*See Blackshear Residents Organization v. Housing Authority of City of Austin*, 347 F.Supp. 1138 (D.Tex.1972).

ticular project would be discriminatory, the fact that Boston's basic eligibility for funds is beyond their capacity to challenge would not necessarily prevent appropriate judicial relief to ensure that HUD carries out its civil rights responsibilities with respect to that particular project.[11]

This is not meant by any means to signal our view that plaintiffs will prevail, or indeed that they have stated a sufficient claim to withstand a motion for summary judgment or a motion to dismiss on another ground. The kind of receivership sought in the prayer for relief, see note 7 supra, is unprecedented. It would take a strong— one might say a unique—showing to support judicial intervention in a project before it is constructed. Moreover, neither the city nor any private developer are parties to this suit. It may be that, for a variety of reasons, judicial relief will turn out to be inappropriate, at least in the form presently sought, and perhaps in any form discernible in this litigation. Still, the foregoing are not considerations that should control the standing issue now under review. They relate more properly to questions of justiciability, and judicial and equitable power, which can better be resolved in another context. For the purpose of reviewing plaintiffs' standing, we think we must assume that the complaint is seeking relief aimed at ensuring that any UDAG project will comply with federal statutory and constitutional anti-discrimination standards. We further think—without at this time purporting to pass on the justiciability and merits of such claims—that they are not so patently far-fetched that we should dismiss them out of hand on the basis of the sparse record now before us, and without further district court determination. Accordingly, we accept such claims provisionally for the very limited purpose of determining whether these particular plaintiffs have standing to raise them.

When the claims are so viewed, the redressability ground dispositive of the question of eligibility ceases to be material. The relief being sought would—or so we must assume for present purposes—make UDAG funded projects more open and accessible to minority residents of Boston, and protect them against discrimination should they reside in such projects. Tangible relief would be afforded to someone. The standing question thus comes down simply to whether the present plaintiffs have a sufficient personal stake to seek such relief.

**III.**

The plaintiffs in these two cases fall into three basic groups. In the first group are the "Black Caucus" plaintiffs, Doris Bunte, Robert Fortes, and Melvin King. These individuals are described in the complaint as black residents of minority neighborhoods in Boston who are also elected representatives of the state legislature. They allege they are "dedicated to working to eradicate racial discrimination in housing and employment on behalf of their constituents." While this is doubtless so, these plaintiffs do not have the requisite personal stake. None alleges he would leave his present neighborhood to move into a UDAG-funded project, even if this opportunity were available to him. Nor are any members of this group alleged to be seeking employment on these projects. Like the environmental organization that claimed standing because of its special interest in environmental issues, these plaintiffs are not suffering a direct harm; they do not satisfy the strictures of Article III. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The second group consists of three black persons whose alleged injury is that racial tension in the city of Boston interferes with

11. Defendants argue that the UDAG statute does not specifically authorize the kind of judicial relief with respect to ongoing projects that plaintiffs, in part, seek. Plaintiffs reply that other laws and constitutional provisions should be interpreted as imposing on HUD the duty to condition these grants. This is not a question

we think should be decided at this stage in connection with the standing issue. The district court can better deal with it on remand, in deciding whether or not it is empowered to grant any of the requested relief, after plaintiffs have indicated more concretely what relief they seek.

the conduct of their daily lives. Plaintiff Sandra Gibbs is the assistant secretary of the Massachusetts Department of Transportation, and in her official capacity she is expected to travel throughout the city. She alleges that her ability to do so is hampered by racial tension which "is perpetuated and exacerbated by racial discrimination in housing and employment opportunities in Boston." Mary Grigsby, a resident of predominantly white West Roxbury, claims that she has been harassed and her home has been vandalized because of racial tension resulting from segregated housing patterns. Plaintiff Laverne S. Roberts allegedly was attacked by white youths while driving through South Boston; as a result of this incident and others reported in the news media, she is afraid to travel through or live in certain areas of the city.

■ These plaintiffs have undoubtedly suffered a serious harm, one that readily satisfies the first prong of the injury-in-fact requirement. Still, we are unpersuaded that any HUD-directed relief emerging from this lawsuit could alleviate, even in a small way, the injury of which these persons complain. Plaintiffs apparently assert that if HUD made a greater effort to ensure affirmative action in federally funded Boston housing projects, then the racially segregated character of the city would change and in turn greater integration would lessen the level of racial tension and permit plaintiffs to live more secure lives. This chain of reasoning, in our opinion, is too attenuated. Admittedly, the Supreme Court has not always required that the reasoning that supports standing proceed with inexorable logic, see *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), but the causal connection must consist of something more than speculation.

Here, there is no indication that "but for" the government's actions plaintiffs' injuries would not exist. *See Duke Power Co. v. Carolina Environmental Study Group*, 438

U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Nor is this situation comparable to *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). There, the Court upheld plaintiffs' standing under Title VIII to challenge alleged "racial steering" by realtors that contributed to segregation of plaintiffs' neighborhood. Even though the plaintiffs had not themselves been "steered," that is, influenced to purchase a home in another area on account of race, the Court found they had suffered the kind of injury Title VIII was enacted to prevent, namely loss of the benefits of living in an integrated area. Despite surface similarities, the difference between this case and *Bellwood*, at least with regard to these plaintiffs, is apparent. A judicial order to realtors to stop "steering" customers by race is likely to have a measurable impact on the racial composition of a localized area. An order to HUD to increase its efforts to promote equal opportunity in Boston's UDAG program is much less certain to affect minority residents of distant neighborhoods. We do not perceive a "substantial likelihood" that the relief requested will redress the injury this group of plaintiffs claims. *Duke Power*, 438 U.S. at 75 n.20, 98 S.Ct. 2620.

The third group of plaintiffs includes the remaining four individuals suing with NAACP,[12] and the individual plaintiffs in the LUCHA action. Each of the NAACP plaintiffs is a black person whose principal claim is that she lives in substandard housing in a segregated area of Boston. Each claims to have sought "decent low-cost housing in an integrated neighborhood" actively over a period of years without success. Plaintiffs' injury is thus the inability to secure such housing. This injury is plainly the sort of palpable harm that satisfies the first prong of the standing test. As to causation and redressability, plaintiffs maintain that if HUD were required to live up to its putative responsibilities under the various statutes and constitutional provi-

---

12. One plaintiff, Laverne Roberts, falls into both the second and third groups, since she alleges injuries of each kind. The other three members of this third group are Mary Lee Cobb, Patricia Link, and Dorothy Paul.

sions they cite, more housing of the sort they seek would be made available to them and they would stand a substantial chance of improving their housing situation.

As we have stated, in ruling on a motion to dismiss for want of standing, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206. Applying this standard, we cannot find that these pleadings are so deficient or so implausible that dismissal is warranted. The situation of these plaintiffs is comparable to that of the individual plaintiff, Ransom, found to have standing in *Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). There, the Court emphasized that Ransom was interested in seeking low-cost housing in Arlington Heights and that he would be qualified for the particular project MHDC was seeking to construct. In contrast to the generalized and attenuated nexus between the harm and the wrong in *Warth v. Seldin*, the Court in *Arlington Heights* found an "actionable causal relationship" between the violation and the asserted injury. 429 U.S. at 264, 97 S.Ct. 555.

█ Although none of the plaintiffs here has specifically alleged an intention to seek housing in a UDAG-financed development, it can reasonably be inferred from their complaint that they would accept such

housing if it were physically safe and financially accessible to them. The conditions plaintiffs seek to have HUD enforce would apparently be aimed at ensuring just that result. Moreover, the complaint charges HUD with failing over a period of years to secure from the city of Boston proper compliance with the civil rights laws. Plaintiffs' inability to find decent and integrated housing during those years, clearly alleged in their complaint, is "fairly traceable" to HUD's asserted misconduct. *See Arlington Heights*, 429 U.S. at 261, 97 S.Ct. 555.[13]

We reach a similar conclusion with respect to the plaintiffs in the LUCHA suit. According to the complaint, Ruth Cruzado is a recipient of public assistance who was rejected for a federal subsidy on her rent due to unavailability of funds. "Over the past several years, [she] has actively sought decent and safe low-cost housing in Chelsea but has been unable to obtain such housing," the complaint states. Maria Crespo is a part-time VISTA worker who has also been refused a Section 8 rent subsidy and who has actively sought alternative housing. Allegedly, she has been waiting six years for a response to her application for a city job. Santos Flores is an unemployed adult male who has actively sought alternative housing and a job with the city. Jimmy Mercado is an unemployed adult male who has sought employment with the City of Chelsea.

█ Each of the first three asserts that he or she is actively seeking to move to

---

13. Defendants contend, nonetheless, that plaintiffs' claim to standing should be barred because their injuries are not ripe. While it is true, as defendants say, that plaintiffs' asserted injuries have not yet occurred, we do not—on the basis of this complaint—view the possibility of their occurring as mere speculation. Plaintiff does not have to allege a completed injury, only that there is an imminent threat of injury. And in determining the issue of imminence, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). Here, the plaintiffs have alleged a long litany of past abuses by Boston housing authorities operating under the supervision and approval of HUD. Various studies and reports

submitted to HUD during the course of the decision process on Boston's grant applications indicated serious problems with equal employment and housing conditions. HUD allegedly approved Boston's current applications despite its knowledge of serious past abuses. It does not seem unreasonable to infer that HUD's approval of these proposals, without conditions, may represent a recurrence of the alleged past pattern of ignoring plaintiffs' statutory and constitutional rights.

We do not mean to indicate that there is no ripeness issue in this case. We leave that determination for the district court. We find only that the complaints of injury are not so speculative, by reason of prematurity, as to deprive plaintiffs of standing.

decent, low-cost housing in a safer and more integrated neighborhood. Plaintiffs claim that the law imposes on HUD an obligation to make such housing available through its development grants program. HUD's alleged failure to do so has a tangible impact on their chances of attaining their goal. Similarly, three of the plaintiffs have unsuccessfully sought employment with the city. They allege HUD's failure to abide by its asserted statutory mandate to enforce affirmative action in employment has decreased their chances to gain employment under Chelsea's CDBG or UDAG programs. Plaintiffs have alleged a tangible harm. They have differentiated themselves from the general bulk of other citizens who are not presently seeking low-cost housing or employment with the city government. We discern a substantial likelihood that the relief they request—if found to be justified—will redress the injuries of which they complain. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 75 n.20, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 262, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1976).[14]

### IV.

We emphasize in conclusion what we have not decided on this appeal. First of all, we have not eliminated the issue of standing from this lawsuit. The plaintiffs we have indicated have standing must continue to carry the burden of proof on standing. *See Simon v. Eastern Ken-*

*tucky Welfare Rights Organization, supra*, 426 U.S. at 45, 95 S.Ct. 2197; *City of Hartford v. Towns of Glastonbury*, 561 F.2d 1032, 1051 (2d Cir. 1976) (en banc). A complaint may suffice to overcome a motion to dismiss and yet fail at summary judgment, when the district court can reasonably expect a more specific factual demonstration of the plaintiffs' entitlement to standing. *Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 45 n.25, 96 S.Ct. 1917. At trial, plaintiffs must prove the facts essential to support their claim to standing. *City of Hartford, supra*, 561 F.2d at 1051.[15] In other words, at this stage of the litigation we say only that plaintiffs have alleged sufficient facts to permit them to overcome the hurdle of a motion to dismiss for want of standing. Like the plaintiffs in *Committee for Full Employment v. Blumenthal*, 196 U.S.App.D.C. ——, 606 F.2d 1062 (1979), plaintiffs Roberts, Cobb, Link, Paul, Cruzado, Crespo, Flores and Mercado, and their organizations, are "entitled to conduct discovery to buttress their allegation that there is a substantial likelihood that the relief they request will eliminate their injury." At ——, 606 F.2d at 1067.

We also do not decide the issue of ripeness on this appeal, *see* note 13 *supra*, nor any of the other issues going to the justiciability of this matter. *See, e. g., Ad Hoc Committee on Judicial Administration v. Commonwealth of Massachusetts*, 488 F.2d 1241 (1st Cir. 1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974). We of course express no opinion on the merits, and no inference should be drawn from anything in this opinion as to the

**14.** As a result of our decision to grant standing, for present purposes, to the individual named plaintiffs who have alleged inability to obtain housing or employment benefits as their injury, we also grant standing to NAACP and LUCHA as representatives of their members. As the Supreme Court said in *Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211–2212:

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the chal-

lenged action of the sort that would make out a justiciable case had the members themselves brought suit."

**15.** To avoid an unnecessary trial, the district court may conduct a preliminary evidentiary hearing on standing or other issues of justiciability. *See Carolina Environmental Study Group v. United States*, 431 F.Supp. 203, 205 (W.D.N.C.1977), *rev'd on the merits sub nom. Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

existence of any of the legal duties plaintiffs have ascribed to the defendants.

Our holding can be briefly summarized as follows. The judgments of dismissal for lack of standing are vacated with respect to plaintiffs Roberts, Cobb, Link, Paul, and NAACP in No. 79–1051, and Cruzado, Crespo, Flores, Mercado, and LUCHA in No. 79–1114. These plaintiffs have standing to go forward with their actions to the extent they challenge the failure by HUD to impose conditions on UDAG funding in Boston and Chelsea designed to foster the affirmative action and anti-discrimination requirements of federal law. In all other respects, the judgments of dismissal for lack of standing are affirmed, as we deem none of the plaintiffs to have standing to challenge HUD's determinations concerning the cities' basic eligibility for UDAG funds.

*Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.*