Marie **THERIAULT, of Presque Isle, County of Aroostook, State of Maine and Elin McKinneon, of Surry, County of Hancock, State of Maine, on their own behalves and on behalf of all those similarly situated, Plaintiffs,**

v.

**The Honorable Joseph E. BRENNAN, Governor of the State of Maine; Timothy P. Wilson, Director, Division of Community Services; their employees, agents, assigns and successors in office; and the State of Maine, Defendants.**

Civ. No. 80–0046 P.

United States District Court, D. Maine.

March 26, 1980.

Susan W. Calkins, Lucinda E. White, Pine Tree Legal Assistance, Inc., Portland, Me., John Whitehouse Cobb, Pine Tree Legal Assistance, Inc., Bangor, Me., for plaintiffs.

Rufus Brown, Asst. Atty. Gen., Augusta, Me., for defendants.

## MEMORANDUM OF OPINION AND ORDER

MITCHELL, District Judge.

This action for declaratory and injunctive relief was brought on February 6, 1980 by two Maine citizens who have received assistance under the Energy Crisis Assistance Program (ECAP), a federal program designed to help low-income persons meet the burden of increased energy costs during this winter heating season. The suit challenges Defendants' administration of the program, particularly (1) their failure to maximize the fund of available monies by implementing a related state program enacted by the Maine Legislature as a part of the Emergency Home Heating Act of 1979 (hereinafter the State Act), and (2) their failure to provide, consistent with federal constitutional due process guarantees, the emergency assistance and written notice of

denial of that assistance to which Plaintiffs are entitled by state and federal statutes and regulations.

On February 8, 1980, following a hearing on the motions, the Court denied Plaintiffs' motion for a temporary restraining order and reserved decision on Plaintiffs' motion seeking class certification and on Defendants' motion to dismiss. On March 13 and 14, 1980, a hearing was held on Plaintiffs' application for preliminary injunction, consolidated with trial on the merits pursuant to F.R.Civ.P. 65(a)(2). On March 25, Plaintiffs' motion seeking class certification was granted.

I. *The Facts*

For the past four winters Maine has participated in ECAP programs conducted under the auspices of the federal Community Services Administration (CSA) pursuant to the powers granted that agency by the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2701 *et seq.* In each of the three previous years, under the Emergency Energy Conservation Service provisions of the federal statute, 42 U.S.C. § 2809(a)(5), CSA channeled roughly $3 million, out of its total $250 million emergency energy allotment, to Maine's Division of Community Services (DCS) for disbursement among eligible recipients. Each year the money arrived considerably after the close of the winter heating season.

Because of their concern that the federal program for this winter would continue at the same level of funding and would again be late, the Governor and DCS Director Wilson in early October urged the Legislature to enact supplementary legislation that would assist Maine's low-income households to meet the crisis expected to result this year from an anticipated severe winter and the soaring cost of energy. In their appearances before the Appropriations Committee of the Legislature Defendants and their representatives made it clear that they were seeking only to supplement the federal program and publicly committed themselves to (1) using federal funds first, and (2) not fully implementing the State Act if the amount of federal funds available in-

creased substantially over what was then anticipated. The Legislature responded on October 11, 1979 by passing the State Act which contained, in Section 2, this statement of legislative purpose:

> [T]here is reason to believe that federal programs designed to cope with this problem will not be in effect, not be adequately funded or both, in a timely and appropriate manner to meet the needs of Maine's low-income households for this coming winter.
>
> Accordingly, the immediate purpose of this legislation is to supplement federal programs aimed at lessening the impact of high energy costs . . . on low-income households.

The Act "established a one-time special Home Heating Crisis Assistance Program for 3 months of the winter of 1979–80." That program, described in Section 6 and funded entirely with state money, is being implemented and is not a subject of this action.

Additionally, a special program to provide "Emergency assistance for certain households receiving Aid to Families with Dependent Children and for other low-income families with children" was set forth in Section 8 of the Act. It authorized a $1.5 million allocation to the State's Department of Human Services (DHS), on the basis of which DHS was to obtain matching funds from the federal Department of Health, Education and Welfare (HEW), the total to be disbursed among certain qualifying low-income Maine households. Both Sections 6 and 8 contained eligibility restrictions which made them mutually exclusive and made them both exclusive of ECAP. Thus, a household certified as eligible for assistance under ECAP or under Section 6 was ineligible for assistance under Section 8; a household certified as eligible for assistance under ECAP or under Section 8 was ineligible for assistance under Section 6.

Emphasizing the Act's supplemental nature, the Legislature required, in Section 5.4, that "If a household qualifies under both federal and state programs, federal funds or federally matched funds shall be

used before state funds." The Legislature required, in Section 6.2.B(1)(d), that "Assistance provided shall be made available to the household in no fewer than 2 installments, 2 of which shall be made no sooner than 30 days apart. The first installment shall be made available on December 14, 1979 or as soon as practicable after the date the household is certified eligible, whichever date comes later." Although the federal regulations governing the ECAP program [1] contained no comparable provision, because the entire energy assistance program in Maine was administered by DCS in a unified manner the 30-day rule was applied to all recipients in an effort to minimize administrative problems.

The Act required, in Section 6.3.G, that applicants denied assistance be given reasons for the denial in writing.[2] Since an applicant eligible for assistance was to be certified only once, even though paid in more than one installment, the State rules [3] were applied so as to require written reasons for denial only to denials of initial certification.[4] Those rules also provided that an applicant could be treated as an emergency case only once,[5] this to reduce the processing backlog created by the fact that emergency applications required more processing than non-emergency applications, and because of the belief of those administering the program that some persons claiming emergencies may have done so falsely while others, principally elderly applicants, actually in an emergency may not have so claimed.

Both the federal regulations and the State Act contained "Maintenance of Effort" provisions. Since compliance with this federal requirement is at the heart of this action, a brief explanation here is appropriate.

Maintenance of Effort is a mechanism by which the federal government seeks to ensure that assistance it provides citizens is not used by states to substitute for assistance previously provided by the states, thereby merely shifting the burden from the states to the federal government. If a state participates in a federal program which includes a maintenance of effort requirement, the state commits itself to add the federal benefits to those previously provided by the state, not to substitute them for the state benefits. Some states in turn apply the requirement to subordinate entities of government.

Finally, in Section 5.3, the State Act made clear that "This one-time program does not entitle any household to a certain amount or form of assistance." [6] The maximum level of assistance was left to be established by DCS.[7] Despite the various

---

1. On September 4, 1979, CSA promulgated regulations applicable to grants funded under 42 U.S.C. § 2809(a)(5). 45 C.F.R. § 1061.70–1 *et seq.* The regulations were amended and became effective on October 11, 1979. 44 Fed. Reg. 58,877.

2. The federal regulations contained a comparable provision. 44 Fed.Reg. 58,878 (to be codified in 45 C.F.R. § 1061.70–7(c)(5)).

3. The Act directed the appropriate state agency to promulgate rules covering the administration of that Section of the Act within its jurisdiction, Section 6 by DCS and Section 8 by DHS. On November 15, 1979 the two agencies jointly promulgated Rules to Implement the Emergency Home Heating Act of 1979 and the State Plan for CSA Energy Crisis Assistance Program (the State Rules). These Rules were amended on January 28 and again on February 29, 1980. Since by then the decision not to implement Section 8 had been made, the amendments were promulgated by DCS alone.

4. DCS read Rules XXII and XVII together to reach this interpretation.

5. Rule XVII.D.

6. The federal regulations contain an almost identical provision: "This one-time CSA-funded program does not entitle any household to a certain amount and/or form of assistance." 44 Fed.Reg. 58,877 (to be codified in 45 C.F.R. § 1061.70–3(b)).

7. The federal regulations gave the Governor discretion to set the maximum level of assistance under the ECAP program, provided it did not exceed $400. The State Act's authority to set the maximum was also exercised by the Governor who combined the two into a single decision covering the entire program. The Governor originally set the maximum under the combined program at $200. On February 29, 1980 he raised it to $350.

sources of the funds, expected to total roughly $8 million, DCS was to administer the entire State program. The State Act took effect when signed by the Governor on October 18, 1979.

On October 17, 1979 the Commissioner of DHS filed an application with HEW requesting $2,362,000 in federal funds to match $1,543,000 in state funds, the total of $3,905,000 to be distributed under Section 8 of the Act. After describing the problem and the State Act, a copy of which was attached, the application stated "If the 1979–1980 federal Community Services Administration Emergency Crisis Assistance Program provides in time, sufficient funding to eliminate the need for this program, the state's program will be dropped."

By letter dated December 3, 1979 HEW approved the application with certain conditions, one of which was that "No duplication of payment will be allowed between this project and any other federal energy assistance program." Thus, HEW reinforced the state's prohibition against households receiving both ECAP and Section 8 assistance by imposing its own prohibition to the same effect.

In the meantime, on November 27, 1979 President Carter signed into law P.L. 96–126, a supplemental appropriations bill which increased CSA's funding both directly ($150 million was added to the existing $250 million CSA allotment) and indirectly ($800 million was made available to the states under several options, one of which, chosen by Maine, allowed for administration in conjunction with ECAP monies). The effect of P.L. 96–126 was two-fold: The amount of money available in Maine increased from the anticipated $8 million to more than double that figure and the time period in which it was to be available for distribution accelerated from the late spring of 1980 to December, 1979 and January, 1980.

As a consequence Defendants decided that implementing Section 8 would be unnecessary and contrary to the State Act's stated purpose of supplementing the once-questionable federal ECAP program. On December 17, 1979, the Commissioner of DHS, as he had said in his application he might do, withdrew the application to HEW for matching funds for Section 8 because, he said in a letter to HEW, "Due to the recently enacted Federal legislation and the subsequent appropriation for the State of Maine, our original plan is no longer needed."

On January 8, 1980, Defendant Wilson held a press conference at the State Capitol in which he commented on the Home Heating Crisis Assistance Program in Maine. In a document entitled "Comments and Background Information" which he distributed at the press conference, he described funding of the program:

[T]he funding picture has changed considerably since October 11, 1979 when the State Legislature passed the Emergency Home Heating Act of 1979. At that time, the State anticipated only about $3 million in crisis funds from the Community Services Administration (CSA). . . . However, on November 8, 1979, less than a week before the Division's deadline for filing its rules for this program, Congress enacted a bill which allocated approximately $19.7 million federal dollars to Maine, in addition to $2 million CSA crisis funds already set aside for Maine. Of the $19.7 million, $14.79 million could be used for the State's crisis program, the other $4.95 million was for direct payment of energy allowance checks to SSI recipients.

Administration of the entire program by DCS began in December, 1979. As authorized by both the federal regulations and the State rules,[8] DCS designated 35 Local Program Operators (LPOs) to implement the program at the local level. Eleven of the LPOs were community action agencies, commonly referred to as CAPs (for community action programs), already in existence pursuant to other provisions of the Econom-

---

8. 44 Fed.Reg. 58,877 (to be codified in 45 C.F.R. § 1061.70 6); State Rules, Section III.

ic Opportunity Act.[9] These 11 LPOs served the largest part of the state in terms of both geography and population. The remaining 24 LPOs were municipalities, many of them small towns in rural areas. Two of the largest LPOs were the Portland Regional Opportunity Program, a CAP which covered the state's most heavily populated area, and Penquis CAP, which originally covered Penobscot and Piscataquis Counties. Because suitable LPOs could not be found in Hancock and Washington Counties, which are adjacent to Penobscot, DCS suggested, and Penquis CAP agreed that it would cover those two counties as well. Thus Penquis CAP's area was among the largest in the state in both geography and population.

From the outset the LPOs were flooded with applicants. By the end of February, 1980, over 48,000 applications had been made, as compared with 15,000 in the entire 1978–79 season. A substantial number of the applicants—in some areas as many as 30%—claimed emergencies.[10] This created significant administrative problems since an emergency application required more pro-

cessing time and effort than did one not involving an emergency. Processing was complicated when some applicants falsely claimed emergencies[11] and when other applicants, not originally emergency cases, became such before receiving assistance.

Many applicants, however, were promptly assisted, including the named plaintiffs. McKinneon applied on December 10 or 11, and was promptly certified as eligible for assistance under ECAP; 86 gallons of oil were delivered to her home the next day. Theriault went to the LPO office in her area on December 9 but it was too busy so she left without applying. She returned on December 11, applied, was certified as eligible under ECAP, and received a delivery of 100 gallons of oil to her home the next day.[12]

Both Plaintiffs were told that they would receive their second installments in 30 days, but they did not. Although DCS had originally intended that the second installments would be automatically delivered 30 days after the first, administrative problems and uncertainty over funding caused a change.[13]

9. 42 U.S.C. § 2781 *et seq.*

10. An emergency was defined by DCS as a household which was out of fuel or expected to run out within 24 hours. State Rules, Section XVII.D.

11. The seriousness of this problem was emphasized by Defendant Wilson at his January 8, 1980, press conference:

[O]ne issue of great concern to me is the number of instances reported to me of people falsely claiming to be in an emergency situation so as to get quick action on their application. In some instances, local program operators have worked like mad to process the "so called" emergency applications within 24 hours and an oil dealer has cooperated by making an extra unscheduled delivery only to find that the tank won't take more than 15 gallons! All the extra energy and time put into speedy processing of such applications is at the expense of another household which really is out of fuel. As there is frequently no way to determine in advance whether or not there *is* a true emergency, I can only ask that people check their oil tank before claiming an emergency, and consider others who are in real need before incorrectly or selfishly claiming an emergency just to speed up their own application.

12. Two of the remaining three recipients who testified in Plaintiffs' behalf received similarly prompt assistance. Albee applied on December 17 and received $97.63 worth of oil on the 18th. Gross, whose affidavit was accepted in lieu of her testimony, applied on December 18 and received 110 gallons of oil on the 20th. The other witness, Foss, applied on December 11. But she provided no proof of income to support her application, as was required, so she was not immediately certified while an investigation of her income level was instituted. One week later, out of oil, she called the LPO and 98 gallons of oil were delivered to her on that day.

13. Funding began on December 11 with $900,-000 in state funds for those persons eligible under the State Act's Section 6 program. The first allotment of CSA funds, $2,025,000, was received in Maine on December 12 and reached the LPOs on December 18. The second CSA allotment, $2,373,000, was received in Maine on January 9 and reached the LPOs six days later. The third federal allotment, an HEW block grant of $10,637,000, was received in Maine on January 23 and reached the LPOs on January 30. The final federal allotment, the $1,788,000 balance of the HEW block grant, was received in Maine on February 20; it was to be distributed to the LPOs on or about March 14.

Because of uncertainty over the availability of funds, and because by mid-January some eligible applicants had not yet received their first installments, DCS imposed a rule which prohibited any applicant from getting a second installment until all applicants had received a first.[14] Applications continued at such a high level throughout December and January that some LPOs were unable to service applicants currently. To meet this problem, DCS authorized some offices to close for short periods of time in February to devote all available energies to processing the backlog.[15] None of the municipal LPOs closed, but five or six of the CAP LPOs did. Penquis CAP closed for all or part of seven days in February. The other four or five closed for lesser amounts of time.

When, in January, contrary to their expectations, Plaintiffs did not receive a second delivery of oil, they contacted their local LPOs and advised them of their emergency conditions. But since they had already been certified as eligible and had received emergency assistance once, they were not again treated as emergency applicants. And since DCS had interpreted the State Rules to require that written notice of denial be given only to applicants denied initial certification, in the view of those administering the program the failure to provide emergency assistance a second time to Plaintiffs did not require written notice of denial, and no such notice was given. Both Plaintiffs have since received their second deliveries and will shortly receive a

third, providing them with the currently available maximum of $350. But they nonetheless claim violation of their rights to emergency assistance in January and to written notice of denial of such assistance at that time.

Whatever problems the program had from December through February, undisputed testimony at the hearing established that the 30-day rule no longer applies; that no LPO is now authorized to close any office and no further closings are anticipated; that the rate of applications is declining and is expected to further decline in the coming weeks; that emergency applicants are being processed promptly as, indeed, are non-emergency applicants; that the total number of households ultimately certified as eligible will approach 50,000; that no funding problems exist and all of the public funds allotted for the program, exclusive of the Section 8 funds, will be disbursed to eligible recipients.

II. *The Relief Sought*

At oral argument Plaintiffs narrowed the requests for relief sought in the complaint. They now ask that this Court

(1) Declare the Defendants' failure to implement Section 8 of the State Act to be in violation of the federal Maintenance of Effort requirement and order the Defendants to propose to the Court a plan to expend all federal and state funds appropriated for emergency energy assistance, including the $3,905,000 originally contemplated under Section 8; such plan, however, to disregard the maximum level of assistance set by the

---

**14.** A Memorandum from Director Wilson to all LPOs, dated January 10, 1980, provided in part that:

> To allow all applicants to get *some* assistance before some applicants get *full* assistance, you should not be paying out 2nd installments until you receive the HEW cash. However, if you have now, or will have with CSA Round II, sufficient cash funds *both* to pay 2nd installments and to continue to pay 1st installments for all new applicants, then there is no reason to hold off on payment of 2nd installments. (emphasis in the original)

**15.** A Memorandum from Director Wilson to all LPOs, dated February 9, 1980, provided in part that:

> I understand that some of you have not been able to process your backlog of applications because of having to deal with emergencies and telephone inquiries. I am therefore authorizing you to close your offices to applications and telephone inquiries if this is necessary *in order to comply with the deadline*. I do ask that you not close for more than one working day at a time and that you not close for the entire day on either Monday or Friday. This means that you could close all day on Tuesday and Thursday; or you could close half a day Monday through Friday; or you could close Monday afternoon, all day Wednesday, and Thursday afternoon. The days and hours you choose will, of course, depend on your individual situation.

Governor and the eligibility requirements written into Section 8 by the Maine Legislature and required by HEW so as to make the Plaintiffs, and the members of the class they represent, eligible to receive additional assistance.

(2) Declare the Defendants' failure to provide emergency assistance to eligible applicants more than once and to provide written notice of denial for second and subsequent requests for such assistance by eligible applicants to be a violation of the constitutional rights of Plaintiffs and the members of the class they represent and order the Defendants to provide such emergency assistance and written notice of denial in the future.

III. *Jurisdiction*

A. *Section 1337(a)*

Three bases of subject-matter jurisdiction have been asserted. Since jurisdiction exists under either 28 U.S.C. § 1337(a) or 28 U.S.C. § 1343(3), there is no need to determine whether 28 U.S.C. § 1331(a)[16] would also suffice.

28 U.S.C. § 1337(a) provides that "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ." Relying on recent holdings[17] that § 1337 grants jurisdiction over cases arising under the Food Stamp Act, 7

U.S.C. §§ 2011 *et seq.*, Plaintiffs contend that the Economic Opportunity Act, 42 U.S.C. §§ 2701 *et seq.*, and P.L. 96–126, the supplemental appropriations bill which funded the ECAP program, should also qualify as "act[s] of Congress regulating commerce . . . ." Defendants counter with the argument that the federal statutes relevant here are more closely akin to the Social Security Act than to the Food Stamp Act. Since the Social Security Act has been held not to qualify as "regulating commerce", *Ortego v. Weinberger*, 516 F.2d 1005 (5th Cir. 1975); *Almenares v. Wyman*, 453 F.2d 1075 (2d Cir. 1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972), Defendants maintain that the statutes here in question should be similarly excluded from the reach of § 1337(a).

▮ The test, which is to be applied broadly, is whether the commerce clause was a significant source of the federal power Congress exercised in enacting the statute in question. *Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963, 969 (D.C.Cir.1977); *Winningham v. United States Dep't of Housing & Urban Dev.*, 512 F.2d 617, 621 (5th Cir. 1975); *Murphy v. Colonial Fed. Sav. & Loan Ass'n*, 388 F.2d 609, 614–15 (2d Cir. 1967). It is immaterial that the power to spend for the general welfare, U.S.Const., art. I, § 8, cl. 1, may have also served as a source of the

---

**16.** 28 U.S.C. § 1331(a) provides that "The district courts shall have original jurisdiction of all civil actions wherein the matter is controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States. . . ." Defendants argue that § 1331(a)'s "amount in controversy" requirement cannot be met here because no single claim exceeds the requisite amount and aggregation of "separate and distinct" claims is forbidden. *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). It may well be, however, that these plaintiffs are among those the rule of *Snyder v. Harris, supra* permits to "unite to enforce a single title or right in which they have a common and undivided interest." *Id.* at 335, 89 S.Ct. at 1056. The First Circuit, for instance, has allowed aggregation when plaintiffs assert "an integrated right against the defendant." *Berman v. Narragansett Racing Ass'n*, 414 F.2d 311, 315 (1st Cir. 1969). The so-called "trust fund" or "common fund" theo-

ry set forth in *Berman* has been extended to embrace class actions for benefits under state and federal assistance programs. *Bass v. Rockefeller*, 331 F.Supp. 945 (S.D.N.Y.1971). The First Circuit does not appear to have ruled squarely on the propriety of that extension, *see United Low Income, Inc. v. Fisher*, 470 F.2d 1074, 1075 n.2 (1st Cir. 1972), and the lower federal courts are in sharp disagreement. *Compare New Jersey Welfare Rights Org. v. Cahill*, 483 F.2d 723, 725 n.2 (3d Cir. 1973) *and Yanez v. Jones*, 361 F.Supp. 701, 706–07 (N.D. Utah 1973) *with Knuckles v. Weinberger*, 371 F.Supp. 565 (N.D.Cal.1973) *and Ingerson v. Sharp*, 423 F.Supp. 139, 143 n.2 (D.Mass.1976).

**17.** *Dupler v. City of Portland*, 421 F.Supp. 1314 (D.Me.1976); *Moreno v. U.S.D.A.*, 345 F.Supp. 310 (D.D.C.1972), *aff'd sub nom. U.S.D.A. v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

power exercised. *Network Project, supra; Murphy, supra,* at 615.

In the first section of the Economic Opportunity Act, 42 U.S.C. § 2701, Congress set forth its purpose: ·

> The United States can achieve its full economic and social potential as a nation only if every individual has the opportunity to contribute to the full extent of the capabilities of such individual and to participate in the workings of our society. It is, therefore, the policy of the United States to eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity. It is the purpose of this chapter to strengthen, supplement, and coordinate efforts in furtherance of that policy.

In furthering this policy of eliminating poverty by "opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity . . .", Congress was pursuing goals analogous to those pursued by such diverse enactments as the Food Stamp Act, the Vocational Rehabilitation Act of 1973, the National School Lunch Act, the National Housing Act, and the Housing and Urban Development Act of 1965. Each of these has been held an act "regulating commerce" within the meaning of 28 U.S.C. § 1337(a).[18]

Moreover, the Economic Opportunity Act authorizes the creation of certain "Special programs and assistance", 42 U.S.C. § 2809. One such special program, authorized under Section 2809(a)(5) dealing with "Emergency Energy Conservation Services", is described as "a program . . . designed to enable low-income individuals and families, including the elderly and the near poor, to participate in energy conservation programs designed to lessen the impact of the high cost of energy on such individuals and families . . . ." The Director of CSA created ECAP under the authority vested in her by this section.

In *Moreno,* the Court held that jurisdiction under § 1337 was proper because "a major congressional purpose in establishing the food stamp program was to 'strengthen our agricultural economy, as well as [to] result in more orderly marketing and distribution of food'." 345 F.Supp. at 313. While the legislative history of P.L. 96–126 reveals no similarly direct and unequivocal language expressive of a purpose to regulate commerce, that history does indicate serious congressional concern over the distribution and marketing of energy resources.[19] Accordingly, the Court concludes that it may hear and decide this action, which arises under Sections 2809(a)(5) and 2812(d) of the Economic Opportunity Act, since that Act of Congress is one "regulating commerce" and thus within the jurisdictional grant of 28 U.S.C. § 1337(a).

---

**18.** *Davis v. Romney,* 490 F.2d 1360 (3d Cir. 1974) (National Housing Act); *Winningham, supra* (Housing and Urban Development Act of 1965); *Dupler, supra* (Food Stamp Act); *Marquez v. Hardin,* 339 F.Supp. 1364 (N.D.Cal. 1969) (National School Lunch Act); *Scott v. Parham,* 69 F.R.D. 324· (N.D.Ga.1975) (Vocational Rehabilitation Act).

**19.** The legislative history contains many indications that the ECAP program was conceived by Congress as one portion, requiring immediate institution, of an overall legislative response to the problems confronting an economy dependent upon the availability of energy. Congress had in mind much more than simply meeting the pressing financial needs of the program's immediate beneficiaries, poor and elderly consumers of energy; consideration also was given to the program's interconnection with the national framework of suppliers and distributors, to which all concerned with the price and availability of energy resources must look. See, e. g., 125 Cong.Rec. H9708, H9732 (daily ed. Oct. 25, 1979) (remarks of Reps. Gilman and Wolff). The inherent balance and stability of the oil market, for instance, was the concern of many who insisted that the program ultimately be funded by revenues from the windfall profits tax legislation then under consideration. See, e. g., 125 Cong.Rec. H9706 (daily ed. Oct. 25, 1979) (remarks of Rep. Conte). And the pricing practices of suppliers and distributors which led to a "cash only" policy on the part of local dealers were noted in both the House and the Senate. 125 Cong.Rec. H9731 (daily ed. Oct. 25, 1979) (remarks of Rep. Wolff); 125 Cong.Rec. S16,610 (daily ed. Nov. 14, 1979) (remarks of Sen. Muskie).

B. *Section 1343(3)*

■ 28 U.S.C. § 1343(3) authorizes civil actions "To redress the deprivation, under color of any State . . . regulation . . . of any right . . . secured by the Constitution of the United States or by any Act of Congress providing for equal rights . . . ." It is not contended that the Economic Opportunity Act qualifies as an "Act of Congress providing for equal rights . . . ." Rather, the gravamen of the complaint involves the asserted invalidity of the State Act in its present form when measured against the requirements of the authorizing federal statute and its implementing regulations. Under *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), "an allegation of incompatibility between federal and state statutes and regulations does not, *in itself*, give rise to a claim 'secured by the Constitution' within the meaning of § 1343(3)." *Id.* at 615, 99 S.Ct. at 1915 (emphasis supplied). To ask, as does Plaintiffs' amended complaint, that the maximum level of assistance be raised and the eligibility requirements be disregarded, is simply to ask that the state scheme be brought into line with the dictates of what Plaintiffs construe the applicable federal requirements to be, and that is precisely the use of § 1343(3) that has been "foreclosed in the wake of *Chapman*." *Lopez v. Arraras*, 606 F.2d 347, 351 (1st Cir. 1979).

However, *Chapman's* use of the qualifying phrase "in itself" would appear to signal the continuing vitality of such "statutory" § 1983 claims when properly cognizable as "pendent" to a constitutional claim "of sufficient substance to support federal jurisdiction" in its own right. *Hagans v. Lavine*, 415 U.S. 528, 536, 94 S.Ct. 1372, 1378, 39 L.Ed.2d 577 (1974). Paragraph 54 of the original complaint, which was unaffected by the amendment to the complaint, sets forth as a "Fourth Claim for Relief" the claim, independent of any purported violation of the federal statute and regulations, that Defendants violated due process safeguards when they instituted the practice of providing written notice of denials of assistance only at the time of an applicant's initial request for assistance, rather than at times when applications were made for subsequent emergency assistance by persons already certified as eligible. Thus this Court's jurisdiction under § 1343(3), "a matter for threshold determination, turn[s] on whether the question [is] too insubstantial for consideration." 415 U.S. at 538–39, 94 S.Ct. at 1380. Since under one interpretation of State Rule XXII.D plaintiffs already in receipt of one energy assistance installment arguably would have been entitled to written notice of the reasons why a later application for emergency assistance had been denied, *cf. Goss v. Lopez*, 419 U.S. 565, 572–73, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973), it cannot be said that the due process issue formally alleged was "too insubstantial for determination." In that event, pendent jurisdiction over the remaining "statutory" claims would follow, without regard to whether they were independently cognizable under § 1343(3). *See, e. g., Kimble v. Solomon*, 599 F.2d 599 (4th Cir. 1979).

IV. *Standing*

■ To have standing to sue one must demonstrate three things. First there must be an "injury in fact", *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152–153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), or, as otherwise stated by the Supreme Court, a "distinct and palpable injury". *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Second, there must be "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group, Inc., et al.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). Third, there must be "a showing that there is a 'substantial likelihood' that the relief requested will redress the injury claimed." *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d 514, 518 (1st Cir. 1979). Thus the relevant standing inquiry is, in the words of the Court of Appeals for this Circuit in the

*N.A.A.C.P.* case: Are Plaintiffs "suffering tangible harm traceable to the challenged actions of the defendant—harm which will be lessened if the requested remedy is granted." 607 F.2d at 519.

Although standing analysis is replete with "complexities and uncertainties,"[20] its primary concern has remained a constant. A federal court is not to proceed unless assured of the presence of the "concrete adverseness," so necessary to proper adjudication, that obtains when the parties before it possess "a personal stake in the outcome of the controversy . . . ." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The search for that "personal stake" remains the "golden thread" through the labyrinth of standing analysis.[21] The doctrine should not be applied so as to avoid resolution of disputes presented by persons having "the personal stake and interest that impart the necessary concrete adverseness to such litigation." *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

While some cases may indicate the contrary, *see, e. g., Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), a pattern of liberalization of standing doctrine so as to broaden access to federal courts may be made out in the major cases elaborating the initial formulation in *Baker v. Carr. See, e. g., Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Data Processing, supra; Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Duke Power, supra.*

When Plaintiffs' motion for a temporary restraining order was denied on February 8 the Court noted that:

Section 8 of the State Act excludes from eligibility for its benefits any person who has been certified as eligible for benefits under the federal ECAP program. Thus it is evident that the named Plaintiffs, having been certified as eligible for benefits under the federal ECAP program, are ineligible for benefits under Section 8. Since they could not receive benefits under Section 8 if it were implemented, they have not established that they will be harmed if it is not implemented.

At oral argument on that motion Plaintiffs were invited to amend their complaint to add as plaintiffs persons not certified as eligible under ECAP and thus eligible for benefits under Section 8. Instead, they reformulated their request for relief. They now ask not only that Defendants be ordered to implement Section 8, but that the order require as well that Defendants disregard both the eligibility requirements written into Section 8 by the Legislature and required by HEW, and the maximum level of assistance imposed by the Governor.

■ Defendants argue that the complaint must now be dismissed for lack of standing for the same reason that the motion for a temporary restraining order was denied. But while it is true that the presence of a plaintiff eligible for assistance under Section 8 would have provided a more appropriate occasion for an adjudication regarding the implementation of that Section, the Court cannot ignore the fact that no such plaintiff is before it because of Defendants' practice of certifying all eligible applicants under ECAP. Thus the very act being challenged—failure to implement Section 8—is the reason why no plaintiff is now eligible for its benefits. Most, if not all eligible applicants, by definition poor

---

**20.** Citing its "complexities and uncertainties," Chief Justice Warren observed that standing represents one of "the most amorphous [concepts] in the entire domain of public law." *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Justice Douglas concurred in this assessment with an oft-cited dictum: "Generalizations about standing to sue are largely worthless as such." *Data Process-*

*ing, supra*, 397 U.S. at 151, 90 S.Ct. at 829 (1970). One commentator recently lamented that "the law of standing lacks a rational conceptual framework . . . ." Tushnet, *The New Law of Standing: A Plea for Abandonment*, 62 *Cornell L.Rev.* 663, 663 (1977).

**21.** See Note, *Standing to Challenge Governmental Action*, 30 *Maine L.Rev.* 31, 36 (1978).

and threatened with cold, are understandably unaware of and disinterested in the precise origin of the assistance they seek and thus unlikely to question their certification for eligibility under ECAP. To require the presence of a party not certified under ECAP but eligible under Section 8 as a prerequisite to· maintenance of this suit would in effect immunize Defendants' action from review and would impose an unreasonable and unrealistic burden on Plaintiffs.

In the final analysis, these Plaintiffs have alleged the deprivation of a pecuniary interest founded on federal statute and regulation (injury in fact). As persons eligible to receive energy assistance under the ECAP program they are "arguably within the zone of interests to be protected" by the maintenance of effort requirement of the federal regulations. *Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. at 830. They have alleged that Defendants' refusal to implement the State Act constitutes a violation of that requirement and that as a result of that violation they received a lower level of assistance than they would have otherwise (causal connection between the claimed injury and the challenged conduct). And if Section 8 is implemented in the manner requested their injuries would be redressed (likelihood that relief requested will redress claimed injury). The availability of an additional $3.9 million for distribution to members of the proposed plaintiff class clearly gives them a significant "personal stake in the outcome of this controversy." This is a sufficient showing to satisfy the underlying values served by the law of standing. Plaintiffs have standing to pursue their second claim for relief.

As to Plaintiffs' first claim, which seeks enforcement of a body of constitutional, statutory, and regulatory law that arguably entitles everyone certified as eligible under ECAP to emergency assistance and written notice of denial thereof, it appears beyond dispute that when Plaintiffs were denied assistance on the basis of the "single emergency" rule they sustained "injury in fact" occasioned by the challenged conduct of Defendants. In addition, there is "a substantial likelihood that the relief requested will redress the injury claimed", since implementation of their proposed version of Section 8 (a remedy ·they have standing to seek) in conjunction with abrogation of the "single emergency" rule, would entitle them to a new maximum benefit level of assistance (including emergency assistance) and would lessen the harm they have sustained. Since these litigants are members of the class of unnamed plaintiffs whose interests they would adequately represent, there is standing both insofar as their own claims and those of other recipients of prior emergency assistance who were or are being denied additional emergency assistance are concerned. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 40 and n. 20, 96 S.Ct. 1917, 1925 and n. 20, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975); *American Jewish Congress v. Vance,* 575 F.2d 939, 943 (D.C.Cir.1978). Plaintiffs have standing to pursue both claims for relief.

## V. *Maintenance of Effort*

When Congress enacted 42 U.S.C. § 2809(a)(5) it authorized the Director of CSA to provide, *inter alia,* financial assistance for programs "designed to lessen the impact of the high cost of energy" on "low-income individuals and families." Pursuant to that authority, beginning in 1976–77 and continuing each winter to date, CSA created an energy assistance program. To put the program into operation two things occurred each year: CSA promulgated regulations governing administration of the program and Congress appropriated funds to finance it. If a state elected to participate its Governor submitted to the Director of CSA for her approval a State Plan, following which the program in that state was administered by an agency designated by the Governor.

On September 4, 1979 CSA promulgated regulations, 45 C.F.R. § 1061.70 *et seq.,* creating the Energy Crisis Assistance Program for this winter. On October 11, CSA amended those regulations, effective in fi-

nal form on that day. 44 Fed.Reg. 58,876 *et seq.* On October 12 Congress approved a so-called "continuing resolution" (P.L. 96–86) which appropriated funds for various programs, including ECAP, at the same level of funding as had existed the previous year. On November 27 a supplemental appropriations bill (P.L. 96–126) was enacted, adding substantially to the funds available for energy assistance this winter.

In the three winters prior to this one, Maine participated in the CSA-funded energy assistance programs. DCS, an agency of the Executive Office, administered the program. No state funds were appropriated or disbursed to recipients. For the reasons noted in the statement of facts, however, in the autumn of 1979 Maine decided to supplement the federal program. On October 11, the Legislature enacted the Energy Home Heating Act of 1979. The Act took effect on October 18 when it was signed by the Governor.

The federal statute authorizing creation of the energy assistance program contained a maintenance of effort provision pursuant to which the Director of CSA cannot approve for participation in ECAP a state plan which does not satisfy her that

> the services to be provided under such [Plan] will be in addition to, and not in substitution for, *services previously provided without Federal assistance . . .* 42 U.S.C. § 2812(d) (emphasis supplied).

By this language Congress intended that participating states not be allowed to cease funding their own already-existing, non-federally assisted energy assistance programs. CSA's regulations indicate that the Director construed the Congressional mandate similarly:

> *Maintenance of Effort.* Resources for similar services scheduled to be provided this heating season under state and local authorities shall not be reduced because of this program nor shall this program be used as a substitute for such services. 44 Fed.Reg. 58,879 (to be codified in 45 C.F.R. § 1061.70(b) ).

Plaintiffs seek enforcement of this requirement, relying on the regulation for their argument that the program authorized by Section 8 of the State Act involved "services scheduled to be provided this heating season" which the State committed itself to maintain when it voluntarily chose to participate in the federal ECAP program. Defendants, placing their emphasis on the statute, contend that the requirement does not apply because Section 8 did not involve "services previously provided without Federal assistance."

Two factors are implicated in a decision on maintenance of effort. They are described in the statute as (1) services previously provided (2) without federal assistance. The regulation promulgated by the Director of CSA, however, describes them as (1) services scheduled to be provided this heating season (2) under state and local authorities. A threshold question presented, then, is whether the two are in conflict and, if so, which controls.

■ It is clear that if a conflict exists the statute controls. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *United States v. New England Coal and Coke Co.,* 318 F.2d 138 (1st Cir. 1963). But it is not clear that a conflict does exist. To the contrary, the regulation can be read, without doing violence to the words chosen by the Director, to implement the stated purpose of Congress, not to change it. "Under state and local authorities" is not inconsistent with "without federal assistance"; nor is "scheduled to be provided this heating season" with "previously provided", especially when read in the context of a program implemented seasonally by CSA on a year-to-year basis.

■ The language of the State Act makes it clear that the Legislature intended only to supplement the federal program which, it was then thought, would provide about $3 million for distribution in Maine after the winter heating season was over. Beyond that, simple chronology suggests that Section 8 was not the ongoing state or local program contemplated by Congress in enacting 42 U.S.C. § 2812(d). The use by

the Director of the words "reduced" and "substitute for" plainly connote pre-existence. This situation is distinguishable from, indeed it is the reverse of, that present in *Dupler v. City of Portland*, 421 F.Supp. 1314 (D.Me.1976), where the city's general assistance program had been in operation for many years before the federal food stamp program was created.

Nor was Section 8 to be a program funded "under state authority" "without federal assistance". By its very terms it was to be financed with matching funds. Indeed, the Legislature made the program expressly "subject to availability of federal matching funds." Section 8.1. In contrast, the general assistance program in *Dupler* was funded entirely by local and state authorities. 421 F.Supp. at 1316.

The conclusion that Defendants' failure to implement Section 8 does not violate the federal maintenance of effort requirement is reinforced by the fact that the record does not reflect any determination to the contrary by the Director of CSA, the person charged with responsibility for enforcement of that requirement. Indeed, not only has the Director been silent on any possible violation of maintenance of effort, she has transmitted CSA funds to Maine and approved amendments to the State Rules well after Defendants publicly announced their intention not to implement Section 8 and described in detail the reasons for that decision.[22]

To buttress their position Plaintiffs contend that all potentially eligible recipients of any government assistance program have a common and constitutionally protected entitlement to the expenditure in their behalf of all funds appropriated for that purpose by the government, federal or state. Thus, they argue, once the Maine Legislature appropriated the money to finance Section 8, the Defendants were compelled to expend that money for the purposes of the program. In support of this contention, they cite several so-called impoundment cases. *Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *Bennett v. Butz*, 386 F.Supp. 1059 (D.Minn. 1974); *Westside Org. Health Servs. Corp. v. Thompson*, 73 Ill.App.3d 179, 29 Ill.Dec. 129, 391 N.E.2d 392 (1979). But in each of those cases the Court found the executive officer to be acting contrary to the intent of the legislative branch and ordered him to act in accordance with that intent. Here the situation is reversed. It is conceded that the Defendants are acting in accordance with the intent of the Maine Legislature. What the Plaintiffs want is an order compelling the executive officer to act contrary to that intent.

This latter contention is further undercut by the fact that the federal regulations governing the ECAP program and State Act both explicitly provide that no household is entitled to any certain amount of assistance, and both endow the Governor with authority to set the maximum level of assistance. In the face of such an explicit grant of authority it cannot be suggested that the Governor's decision to set the max-

---

22. In those amendments Defendants manifested their decision not to implement Section 8. In their initial version, dated November 15, 1979, the State Rules, in Section II, described the program's funding:

> There are 4 separate funding sources available to the State of Maine at present:
> 1. Unmatched State funds appropriated in the recent Special Session;
> 2. Federal/State matching funds matched by HEW (Federal Department of Health, Education and Welfare) for services to AFDC recipients;
> 3. Federal/State matching funds matched by HEW for services to low-income, non-AFDC families with dependent children; and

> 4. CSA (Federal Community Services Administration) funds for an Emergency Crisis Assistance Program.

In the January 28, 1980 and February 29, 1980 amendments to the Rules, both of which were approved by the Director, the program's funding is described as:

> There are 3 separate funding sources available to the State of Maine at present:
> 1. State Funds appropriated October 11, 1979 by Chapter 574, Public Law (1979);
> 2. Federal Community Services Administration (CSA) funds for an Energy Crisis Assistance Program (ECAP); and
> 3. Federal Health, Education and Welfare (HEW) Block Grant funds to be added to CSA funds for ECAP.

imum at $350 is contrary to legislative intent. Nor in the context of this case can it be seriously argued that his decision was arbitrary or capricious. The decision of the Defendants not to implement Section 8 of the State Act did not violate the federal maintenance of effort requirement.

## VI. *Emergency Assistance and Written Notice of Denial*

Plaintiffs claim that their right to emergency assistance was violated in January when their request for such assistance was denied. The right is alleged to arise from both the federal regulations and the State Plan and Rules.

### A. *The Claim is Not Moot*

With the maintenance of effort claim decided against Plaintiffs, so that there remains no basis for an entitlement to more than the maximum level of assistance set by the Governor, Defendants' argument that Plaintiffs' second claim is moot takes on added force. The named Plaintiffs have received all benefits to which they are entitled. In addition, nothing in the record refutes the contention that other claimants, who may not have received all of their benefits by the date of the hearing (March 13), have nonetheless by now also been paid all monies to which they are entitled. Witnesses called by both sides testified uniformly that the program is now running so well that all payments are current, with present eligible applicants, whether or not on an emergency basis, receiving their full entitlement all at once in a single payment; the decline in applicants and the rise in temperatures ensure that the program will continue to function smoothly. As a consequence, it could well be concluded that no potential plaintiff can now be subjected to the rule forbidding second emergency installments.

Nonetheless, on this record Defendants cannot be said to have carried their "heavy" burden of demonstrating that "there is no reasonable expectation that the wrong will be repeated." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). And even if the claim for injunctive relief had been mooted, *see DeFunis v. Odegaard*, 416 U.S. 312, 316–17, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974), there would remain the need to reach and decide the declaratory judgment claim. *See Quern v. Mandley*, 436 U.S. 725, 733–34 n. 7, 98 S.Ct. 2068, 2073–74 n. 7, 56 L.Ed.2d 658 (1978). To find mootness because of the program's currency one would have to ignore the obvious waiting period for the third installments newly available as a result of the recent increase of the maximum benefit level, estimated by Defendant Wilson in a February 29 memorandum at "3 weeks on average". This period appears unaffected by the recent amendment to the State Act (incorporated into the State Rules and the State Plan as of February 29, 1980) doing away with the 30-day forced wait between first and second installments. P.L. 1979, ch. 617. A February 29 memorandum from Defendant Wilson to the local program operators explaining the effect of the upcoming changes restricted the new scheme's application to "credits" (as opposed to the "purchase orders" employed when dealing with emergencies), and expressly retained a prohibition against emergency processing of third installments. The latest versions of the State Plan and State Rules are to the same effect.[23]

Thus it appears clear that continuing requests for subsequent emergency assistance are contemplated, and that Defendants will employ the challenged practice if and when the opportunity arises. And future unnamed plaintiffs denied emergency assistance a second time may well be mooted as quickly and effectively as were the named Plaintiffs. Despite any mootness of the named Plaintiffs' claims, then, this aspect of the controversy, involving as it does a "special one-time program", seems to fall squarely within the doctrine employed to save such claims from mootness when the underlying circumstances reveal that a con-

---

**23.** Sections I.C. 4(c) & 6(b) of the State Plan, as amended February 29, 1980; Sections XI.B & XVII.D.3 of State Rules, as amended February 29, 1980.

tinuing impact of the challenged conduct will be felt by others. When the Defendants have not met their heavy burden that there is no reasonable expectation that the challenged action is likely to recur and when the Court will probably never have a more "live" disputant before it, the case is "capable of repetition, yet evading review" and the assumption of jurisdiction is warranted for the purpose of adjudicating the unnamed plaintiffs' claims. *Sosna v. Iowa*, 419 U.S. 393, 399–400, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975). Finally, the likelihood of recurrence appears sufficiently real that this Court's failure to certify the class until the claims of all named Plaintiffs had been mooted should not operate to defeat the claims of the unnamed plaintiffs. *See Swisher v. Brady*, 438 U.S. 204, 213 n. 11, 98 S.Ct. 2699, 2705 n. 11, 57 L.Ed.2d 705 (1978).

### B. *The Merits of the Claim*

■ Section 1061.70–8 of the federal regulations [24] is entitled "What these funds can be used for." The first paragraph states that "Funds made available under this program must be used to provide assistance to eligible households to offset the high cost of household energy. Only the following types of assistance can be provided with these funds:" There follow four subparagraphs identifying possible types of assistance, the last of which is "(d) Where necessary to prevent hardships or danger to health the provision of immediate assistance in the form of goods or services such as emergency fuel deliveries  . . . ."

This regulation permits rather than requires emergency assistance to be provided. The language of the regulation is unambiguous. Its plain meaning, which "controls when sufficiently clear in its context," *Ernst & Ernst, supra*, 425 U.S. at 201, 96 S.Ct. at 1384–85, makes mandatory only that federal funds made available under this program be used "to offset the high cost of household energy" and that the type of assistance provided be limited to one or more of the four thereafter listed. To read

the regulation's "can" as "must" would make it mandatory for those administering the program to provide every type of assistance listed, an interpretation obviously at odds with the overall thrust of the regulations. The plain language of the regulation defeats the Plaintiffs' claim.

Plaintiffs further suggest that even if the federal regulations do not require emergency assistance, the State Plan and Rules, by making some emergency assistance available, committed the Defendants to provide such assistance whenever requested to do so by an eligible applicant. This contention cannot withstand an analysis of the State Rules.

First, the very rules which authorize assistance in emergencies also limit such assistance to one time per household. Plaintiffs cannot rely on that part of the Rules which tends to support their contention and simply ignore that which does not. The Rules must be read as a whole. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

Second, since the federal regulations do not compel emergency assistance, the fact that DCS chose voluntarily to provide it once per household simply does not support the argument that it thereby committed itself to provide such assistance a second or third time. As the evidence as a whole makes clear, DCS's decision to limit emergency assistance to a single instance per household was a rational one based upon the reasonable belief of its Director that the limitation was necessary to prevent the processing of applications from breaking down completely under the weight of the large number of applications and the large percentage of applicants claiming emergencies. Plaintiffs had no right to emergency assistance beyond the one time provided in the State Rules.

Both the federal regulations and the State Rules require notification to applicants in writing of the reasons for denial of

---

**24.** 44 Fed.Reg. 58,878 (to be codified in 45 C.F.R. § 1061.70 -8).

assistance.[25] DCS interpreted these requirements to be limited to applicants denied initial certification. In its view applicants like the Plaintiffs who by January had been certified as eligible for the maximum level of assistance, who had already received the first installment, and who would soon thereafter receive the second and third installments, simply were not "denied assistance" and thus not entitled to written notice. Since it has already been determined that Plaintiffs had no right to emergency assistance more than once, it follows that DCS's refusal to treat them as emergency applicants a second time was not a denial of assistance requiring written notice.

Nothing in the regulations or rules compels a contrary conclusion. The regulations consider a denial to have occurred when "the benefits or services and/or funds currently are available, the local program operator has the authority to provide or disburse them" and the applicant is otherwise eligible.[26] Here neither of the first two requirements was met. The services (emergency assistance on more than one occasion) were not currently available because not offered in DCS's program. And the local program operators did not have the authority to provide them; indeed they were specifically prohibited from doing so by the State Rules. Plaintiffs had no right to written notice of denial when they were not treated as emergency applicants in January.

VII. *Conclusion*

A final consideration reinforces this decision. Throughout this proceeding Plaintiffs have urged upon the Court an expansive interpretation of its equitable powers. That those powers are formidable cannot be doubted. But their very scope mandates prudence in their exercise.

While it has consistently affirmed the broad powers of federal courts, the Supreme Court has urged that those powers be exercised only when the need is clear and compelling when the principle of federalism is implicated. Although stated in other contexts and thus not directly applicable here, these words of caution by the Supreme Court do provide general guidance:

> The seriousness of federal judicial interference with state civil functions has long been recognized by this Court. We have consistently required that when federal courts are confronted with requests for such relief, they should abide by standards of restraint that go well beyond those of private equity jurisprudence . . . '[N]o injunction ought to issue against officers of a State clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury'. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975).

> Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law'. *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976).

Here, Plaintiffs ask the Court to order the Governor of Maine to act in direct defiance of a state law, even though, Plaintiffs concede, that state law is not unconstitutional, does not conflict with a federal statute and is not inherently unreasonable. The facts of this case, supported by sound reasons of public policy, persuade the Court to refrain from granting the requested relief.

VIII. *Direction for Entry of Judgment*

In accordance with the foregoing, it is

ORDERED that judgment be entered for the Defendants Timothy P. Wilson, Joseph E. Brennan and the State of Maine against the Plaintiffs Marie Theriault and Elin McKinneon, and the Clerk of this Court is hereby directed to make entry of such judgment forthwith.

---

**25.** 44 Fed.Reg. 58,878 (to be codified in 45 C.F.R. § 1061.70–7(c)); State Rules, Section XXII.

**26.** 44 Fed.Reg. 58,878 (to be codified in 45 C.F.R. § 1061.70–7(c)(3)).