Marie THERIAULT et al.,
Plaintiffs-Appellants,

v.

The Honorable Joseph E. BRENNAN et al., Defendants-Appellees.

Nos. 80–1349, 80–1450.

United States Court of Appeals,
First Circuit.

Argued Oct. 8, 1980.

Decided Feb. 12, 1981.

Lucinda White, Portland, Me., with whom Susan Calkins, Portland, Me., and John Whitehouse Cobb, Bangor, Me., were on brief, for plaintiffs-appellants.

William C. Nugent, Asst. Atty. Gen., Augusta, Me., with whom Richard S. Cohen, Atty. Gen. and Rufus E. Brown, Asst. Atty. Gen., Augusta, Me., were on brief, for defendants-appellees.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiffs-appellants, a class of low-income residents of the State of Maine, appeal a decision of the district court 488 F.Supp. 286 holding that state officials, including defendant governor, did not violate the maintenance of effort requirement of the federal Energy Crisis Assistance Program (ECAP) by not funding special state legislation enacted to supplement the federal low income-heating program.

The issue on cross-appeal is standing.[1]

The State of Maine has participated each winter since 1976 in the ECAP, operated by the federal Community Services Administration (CSA) pursuant to the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2701 *et seq.* CSA granted the Maine Division of Community Services (DCS) approximately three million dollars in each of the first three winters (1976–1978) to administer ECAP at the state level. The state found the program inadequate both because federal funding did not reflect the increasing costs of heating and because DCS did not receive the grants until the winter was over. For these reasons and with the belief that Maine would not receive substantially more funding than it had in the past, defendant governor called the legislature into special session in October 1979, urging the enactment of legislation which would supplement the federal government's pending bills. Defendants and their representatives stated in appearances before the appropriation committee of the legislature they would use federal funds first and not fully fund the proposed legislation if sufficient federal funds, not then expected, became available. Section 2 of the Maine Emergency Home Heating Act of 1979 (the State Act), enacted on October 11, included the following statement of legislative purpose:

[T]here is reason to believe that federal programs designed to cope with this problem will not be in effect, not be adequately funded or both, in a timely and appropriate manner to meet the needs of Maine's low-income households for this coming winter.

Accordingly, the immediate purpose of this legislation is to supplement federal programs aimed at lessening the impact

---

1. At the time this case was submitted to us, the appellees also challenged the district court's ruling that the Commerce Clause was a source of authority for the enactment of the Economic Opportunity Act, that ECAP was created under the "special programs and assistance" section of the Act, 42 U.S.C. § 2809, and that the Act was, therefore, within the jurisdictional grant of 28 U.S.C. § 1337(a). We need not consider the question of whether the Commerce Clause is a proper jurisdictional basis for this action, because on December 1, 1980, the Congress amended 28 U.S.C. § 1331, clearly vesting us with jurisdiction:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Federal Question Jurisdictional Amendments Act of 1980".

Sec. 2.(a) Section 1331 of title 28, United States Code, is amended to read as follows: "§ 1331. Federal Question

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.".

(b) The item relating to section 1331 in the table of sections for chapter 85 of title 28, United States Code, is amended by striking out "; amount in controversy; costs".

Federal Question Jurisdictional Amendments Act of 1980, Pub.L.No. 96–486, 94 Stat. 2369 (1980).

of high energy costs . . . on low-income households.

1979 Me.Legis.Serv. ch. 574 § 2.

The State Act created several energy programs. Germane to this appeal is Section 8, which was to provide emergency energy assistance to households receiving benefits under the Aid to Families with Dependent Children program and to other specified households. Section 8 consisted of an eligibility restriction which made it exclusive of both ECAP and Section 6 of the State Act.[2] Thus, a family certified for aid under ECAP or Section 6 was ineligible for assistance under Section 8, while a household certified as eligible for aid under Section 8 or ECAP was ineligible for support under Section 6. Further, the State Act stated that "[t]his one-time program does not entitle any household to a certain amount or form of assistance." 1979 Me.Legis.Serv. ch. 574 § 5.3. It gave the governor discretion to set the maximum level of assistance.

The State Act authorized a $1.5 million appropriation to be matched by available federal funds from the Department of Health, Education and Welfare (DHEW). The state's application to DHEW for matching funds declared:

> If the 1979–1980 federal Community Services Administration Emergency Crisis Assistance Program provides in time, sufficient funding to eliminate the need for this program, the state's program will be dropped.

DHEW approved the state's application on December 3, 1979, but attached as one of its conditions that "[n]o duplication of payment will be allowed between this project and any other federal energy assistance program."

During this period, Congress was at work on ECAP legislation for the winter of 1979–80. Six days before the State Act became

effective, Congress passed a continuing resolution funding ECAP at the same level as in the previous year. Appropriations Act—Fiscal year 1980 Continuance, Pub.L.No. 96–86, 93 Stat. 656 (1979). A supplemental appropriations measure, Appropriations Act—Department of the Interior and Related Agencies, Pub.L.No. 96–126, Tit. II, 93 Stat. 978 (1979), which President Carter signed into law on November 23, 1979, had the effect of more than doubling the amount of federal energy assistance funds available to Maine, from about $8 million to approximately $16 million. Moreover, the dates when Maine was to receive the funds (formerly scheduled for the late spring of 1980) were advanced to December 1979 and January 1980.

Earlier, on September 4th, CSA set forth regulations for ECAP, effective, as amended on October 11th. 44 Fed.Reg. 58,877 (to be codified in 45 C.F.R. § 1061.70). Among those regulations was one construing the "maintenance of effort" provision in the statute authorizing creation of ECAP.[3] Through this regulation, the federal government, which supplies the aid, requires the state to use the new federal funds as a supplement to, and not as a substitute for, those monies the state is already providing itself for the program.

As a result of the significant increase in federal funding and the advanced timetable for the allocation of funds, defendants concluded that the implementation of Section 8 of the State Act would be unnecessary as well as violative of the State Act's declared purpose of supplementing an anticipated inadequate federal program. On December 17, 1979, the Commissioner of Maine's Department of Human Services (DHS) withdrew the application to DHEW for matching funds for Section 8 because he determined that they were no longer needed.

---

**2.** Section 6 discussed the rulemaking procedures pursuant to Home Heating Crisis Assistance Program of the Act—a program not under review in this case.

**3.** The statutory language states:
(d) No program shall be approved for assistance under sections 2808 and 2809(a) of this

title unless the Director is satisfied that (1) the services to be provided under such program will be in addition to, and not in substitution for, services previously provided without federal assistance . . . .
42 U.S.C. § 2812(d).

The Maine Legislature "deappropriated" Section 8 funds on April 1, 1980. Me.Pub.L. 1980 ch. 711, Part B.

On February 6, 1980, a complaint was filed on behalf of a class of low-income residents challenging practices and procedures of the defendants in the operation of the state and federal fuel assistance programs in Maine for the 1979–80 heating season. Plaintiffs claimed that defendants violated the maintenance of effort requirement and challenged the defendants' failure both to provide emergency fuel assistance and to give written notices of denial of emergency assistance. After abbreviated discovery, the district court conducted a thorough hearing on the motion for a preliminary injunction, consolidated with a trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). In a comprehensive memorandum of opinion and order, the district court found for defendants. This appeal followed.

Appellants contend that elimination of the Section 8 fuel program as a result of the passage of the federal legislation contravened the maintenance of effort requirement of the federal program. The cross-appeal issue is whether plaintiffs had standing to pursue their claims.

We must first consider plaintiffs' contention that defendants' Notice of Cross-Appeal was not timely filed and that the district court's granting of defendants' motion to enlarge the time to file a cross-appeal was based on an erroneous standard. For their part, state officials argue that the failure of the plaintiffs to file a second notice of appeal from the order granting said motion now bars them from raising the issue.

■ As to the argument that the Notice of Cross-Appeal was not timely filed and that the issue of plaintiffs' standing is not properly before this court, we simply note that federal courts may examine standing issues, even if not raised by the parties. *See, e. g., Orr v. Orr*, 440 U.S. 268, 271, 99 S.Ct. 1102, 1107, 59 L.Ed.2d 306

(1979); *Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977).[4] We find that the plaintiffs met the three-pronged test of *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d 514, 518–19 (1st Cir. 1979). The "distinct and palpable injury" prong, *see Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), was met by plaintiffs' alleged deprivation of a pecuniary interest granted by federal statute and regulation. The second prong requires a " 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1979). We agree with the district court that a causal connection between the injury and the conduct was established by the claim that defendants' refusal to implement the State Act contravenes federal requirements and that their level of assistance was lower than it would have been had no violation occurred. And we also find that plaintiffs have shown a "substantial likelihood" that the relief requested will redress the injury suffered. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. at 75 n.20, 98 S.Ct. at 2631 n.20. Although the State Act vests the governor with discretion to set maximum levels of assistance, it seems highly unlikely that assistance would not be increased if Section 8 were implemented. The standing requirements have been met, because the plaintiffs are "suffering tangible harm traceable to the challenged actions of the defendant—harm which will be lessened if the requested remedy is granted." *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d at 519.

■ We turn now to the merits. Plaintiffs argue that by failing to implement Section 8 of the State Act, defendants violated the "maintenance of effort" provision of the Energy Crisis Assistance Program (ECAP), 42 U.S.C. § 2812(d), which provides in pertinent part "that the services to be provided under such program will be in addition to, and not in substitution for,

---

**4.** In the instant case, appellees did raise the standing question in the district court.

*services previously provided without Federal assistance[.]"* (emphasis added).

Section 2809(a) of ECAP authorizes CSA to provide aid to "lessen the impact of the high cost of energy" on low income families. 42 U.S.C. § 2809(a). A CSA regulation provides:

> (b) *Maintenance of Effort.* Resources for similar services scheduled to be provided this heating season under state and local authorities shall not be reduced because of this program nor shall this program be used as a substitute for such services. The Director of CSA may make exceptions only in those situations where a strict application of this requirement would result in unnecessary hardship or be inconsistent with the purposes of the Energy Crisis Assistance Program.

44 Fed.Reg. 58,879 (to be codified in 45 C.F.R. § 1061.70(b)).

It is clear that these "maintenance of effort" provisions were intended to ensure that federal assistance is not used by states merely to shift the burden of paying for state programs already in existence from the state to the federal government. The question is whether the de-appropriation of funds for Section 8 of the State Act was such a shift. We find the reasoning of the district court persuasive and dispositive. It held that, since Section 8 was intended only to supplement the federal program in the event that federal funding was insufficient, there was no reduction of funding by Maine because of its participation in the ECAP program and that the federal program was not used as a "substitute" for state services. The district court also pointed out that, because the state program would have been financed in part by HEW funds and thus subject to HEW supervision, it was not funded "under state authority" "without Federal assistance." It reinforced its conclusion with the observation that CSA made no complaint about any possible violation of maintenance of effort, but in fact continued to transmit funds to Maine after cancellation of the Section 8 program.

The district court's careful analysis makes it clear that, from its inception, Sec-tion 8 was not an independent state program but a contingency plan structured around the contours of the federal program under which Maine had operated for the previous three years.

*Affirmed.* No costs to either party.